118 T.C. No. 25

UNITED STATES TAX COURT

MICHAEL T. CARACCI AND CINDY W. CARACCI, ET AL.,[1]
Petitioners <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 12481-99, 12482-99,    Filed May 22, 2002.
12483-99, 14711-99X,
17333-99, 17334-99,
17335-99, 17336-99X,
17337-99, 17338-99,
17339-99X,17340-99,
17341-99, 17342-99.

---

[1] Cases of the following petitioners are consolidated herewith: Vincent E. and Denise A. Caracci, docket No. 12482-99; Christina C. and David C. McQuillen, docket No. 12483-99; Sta-Home Home Health Agency, Inc., of Grenada, Mississippi, docket No. 14711-99X; Sta-Home Health Agency of Carthage, Inc., docket No. 17333-99; Sta-Home Health Agency of Greenwood, Inc., docket No. 17334-99; Michael Caracci, docket No. 17335-99; Sta-Home Home Health Agency, Inc., of Forest, Mississippi, docket No. 17336-99X; Victor Caracci, docket No. 17337-99; Christina C. McQuillen, docket No. 17338-99; Sta-Home Home Health Agency, Inc., docket No. 17339-99X; Joyce P. Caracci, docket No. 17340-99; Vincent E. Caracci, docket No. 17341-99; and Sta-Home Health Agency of Jackson, Inc., docket No. 17342-99.

Members of the C family wholly own three home health care organizations (P1, P2, and P3) exempt from Federal income taxes under sec. 501(c)(3), I.R.C. In 1995, the C family created three S corporations (S1, S2, and S3) and collectively received all of the resulting stock. P1, P2, and P3 then transferred all of their assets to S1, S2, and S3, respectively, in exchange for each transferee's assumption of the transferor's liabilities. R determined that the fair market value of the transferred assets substantially exceeded the consideration received in exchange. Accordingly, R determined S1, S2, S3, and members of the C family were liable for excise taxes under sec. 4958, I.R.C., and members of the C family who received stock in S1, S2, or S3 but did not have an ownership interest in P1, P2, and P3 were liable for income taxes on the value of the stock received. R also revoked the tax exemptions of P1, P2, and P3. Held: The transferred assets' value at the time of transfer decided. Held, further, the value of the transferred assets exceeded the value of the consideration received; thus, S1, S2, S3, and members of the C family are "disqualified persons" subject to excise taxes under sec. 4958, I.R.C., as beneficiaries of "excess benefit transactions". Held, further, although P1, P2, and P3 engaged in "excess benefit transactions", a revocation of their tax-exempt status is inappropriate given the "intermediate sanctions" under sec. 4958, I.R.C. Held, further, the three members of the C family are not liable for the income taxes determined by R.

David D. Aughtry and Vivian D. Hoard, for petitioners.

Robin W. Denick and Mark A. Ericson, for respondent.

LARO, Judge: These cases are before the Court consolidated. Petitioners seek review of respondent's determinations for 1995 of income tax deficiencies, excise tax deficiencies under section 4958, accuracy-related penalties under section 6662(a), and

revocations of exempt status under section 501(c)(3).[2]

Respondent determined the following income tax deficiencies and accuracy-related penalties:

| Petitioner | Deficiency | Accuracy-related penalty sec. 6662(a) |
|---|---|---|
| Michael T. and Cindy W. Caracci | $2,192,643 | $438,528.60 |
| Vincent E. and Denise A. Caracci | 1,272,216 | 254,443.20 |
| Christina C. and David C. McQuillen | 1,272,307 | 254,461.40 |

Respondent determined the following excise tax deficiencies:

| | Deficiency | | |
|---|---|---|---|
| Petitioner | Sec. 4958 (a)(1) | Sec. 4958 (a)(2) | Sec. 4958 (b) |
| Sta-Home Health Agency of Carthage, Inc. | $1,948,559 | -0- | $15,588,474 |
| Sta-Home Health Agency of Greenwood, Inc. | 1,384,944 | -0- | 11,079,522 |
| Sta-Home Health Agency of Jackson, Inc. | 1,302,420 | -0- | 10,419,362 |
| Joyce P. Caracci | 4,635,923 | $30,000 | 37,087,388 |
| Michael Caracci | 4,635,923 | 30,000 | 37,087,388 |
| Victor Caracci | 4,635,923 | -0- | 37,087,388 |
| Vincent E. Caracci | 4,635,923 | -0- | 37,087,388 |
| Christina C. McQuillen | 4,635,923 | 30,000 | 37,087,388 |

Respondent determined that the three Sta-Home tax-exempt entities failed to qualify for tax-exempt status under section 501(c)(3).[3]

---

[2] Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the year in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

[3] The three Sta-Home tax-exempt entities are Sta-Home Home Health Agency, Inc., Sta-Home Home Health Agency, Inc., of Forest, Mississippi, and Sta-Home Home Health Agency, Inc., of Grenada, Mississippi. The three entities against which respondent determined excise tax deficiencies are the Sta-Home for-profit entities.

Following respondent's concession that none of petitioners are liable for section 4952(a)(2) excise taxes or section 6662(a) accuracy-related penalties, we are left to decide: (1) Whether Joyce Caracci, Michael Caracci, Victor Caracci, Vincent Caracci, Christina McQuillen, and the Sta-Home for-profit entities are liable for excise taxes under section 4958 because of the transfers of assets from the Sta-Home tax-exempt entities to the Sta-Home for-profit entities in exchange for the transferees' assumption of the transferors' liabilities (the asset transfer); (2) whether Michael Caracci, Vincent Caracci, and Christina McQuillen, as shareholders of the Sta-Home for-profit entities but not of the Sta-Home tax-exempt entities, are liable for income taxes in connection with the asset transfer; and (3) whether the asset transfer resulted in a revocation of the Sta-Home tax-exempt entities' tax-exempt status on account of a violation of section 501(c)(3); i.e., the transfer resulted in the Sta-Home tax-exempt entities' being operated for a substantial nonexempt purpose, constituted prohibited inurement, and impermissibly benefited private interests.[4]

---

[4] The parties also dispute who bears the burden of proof as to the central issue in this case; namely, the value of the transferred assets. We do not decide that dispute. Our findings of value are based on our examination of the evidence in the well-developed record, which, in relevant part, includes stipulated facts, expert reports, other exhibits, and witness testimony.

FINDINGS OF FACT

Some facts have been stipulated. We incorporate herein by this reference the parties' stipulation of facts and the exhibits submitted therewith. We find the stipulated facts accordingly. The couples, Michael and Cindy Caracci, Victor and Joyce Caracci, Vincent and Denise Caracci, and Christina and David McQuillen, are husband and wife, each of whom resided in Mississippi when the petitions were filed. Christina McQuillen is the sister of Michael and Vincent Caracci, and the three of them are the children of Victor and Joyce Caracci (the father, mother, and three children are referred to collectively as the Caracci family). The principal place of business of the various Sta-Home entities also was in Mississippi at that time.

From 1973 to 1976, Joyce Caracci served as a consulting nurse for the State of Mississippi Board of Health, surveying health care facilities for participation in the Medicare/Medicaid programs. On May 3, 1976, Joyce Caracci, Victor Caracci, and a third individual not relevant herein started Sta-Home Home Health Agency, Inc. Approximately 1 year later, Joyce Caracci, Victor Caracci, and a third individual not relevant herein formed the other two Sta-Home tax-exempt entities. Each of the Sta-Home tax-exempt entities was formed as a nonstock corporation under Mississippi law, with Victor and Joyce Caracci as the owners

during all relevant times.  In the early years of their business, Victor and Joyce Caracci borrowed money collateralized by their residence to fund the Sta-Home tax-exempt entities' operations, and they (the individuals) guaranteed the extension of credit to the entities.  Throughout the years, the managers of the three separate entities generally operated the entities as one integrated unit.  (Because the parties also generally treat the three separate entities as one integrated unit, so do we.)  During the subject year, Joyce Caracci, Michael Caracci, and Christina McQuillen were the Sta-Home tax-exempt entities' only directors and officers.  Those entities employed or retained the following Caracci family members or spouses in the corresponding position:

| Individual | Position |
|---|---|
| Victor Caracci | Consultant |
| Joyce Caracci | Chief operating officer/administrator |
| Michael Caracci | Chief executive officer |
| Christina McQuillen | Director of personnel |
| Vincent Caracci | General counsel |
| Denise Caracci | Nurse (from August 1991 to May 1995) |
| David McQuillen | Maintenance man |

The Sta-Home tax-exempt entities participated in the Medicare program.  Medicare was established in title XVIII of the Social Security Act, Pub. L. 89-97, 79 Stat. 291 (1965), and is the principal health care insurance for individuals who are

either disabled or aged 65 or older.  It is administered by the Healthcare Financing Administration (HCFA), a division of the U.S. Department of Health and Human Services, with whom private insurance companies in different regions of the country have contracted to serve as fiscal intermediaries.

In 1995, Medicare reimbursed home health care providers at an amount that equaled the lesser of the actual reasonable cost or customary charges, up to the maximum "cost cap"; i.e., the aggregate per-visit costs limitation under the law applicable to Medicare.  During 1995, Medicare paid home health care agencies for the necessary services they provided to covered beneficiaries on a retrospective cost system under which Medicare sent a "periodic interim payment" (PIP) every 2 weeks to home health care agencies to cover claims activity.  The Sta-Home tax-exempt entities used the PIP payments to fund their payroll, which was paid biweekly.  Home health care agencies also submitted quarterly reports and filed annual cost reports with the fiscal intermediary.  If PIP payments differed from the payments allowable as ascertained from the cost report, the fiscal intermediary made the appropriate adjustment by reimbursing the home health care agency for an underpayment or requiring the agency to remit an overpayment.  The Aetna Insurance Co., which was the fiscal intermediary for the Sta-Home tax-exempt entities,

disallowed the Sta-Home tax-exempt entities' claimed costs on various items such as advertisements, pencils, cell phones, pagers, desks, and nurse recruiting. The average amount of disallowed costs annually was .7 percent.

Under Mississippi law, a certificate of need (CON) is required to operate a licensed home health agency. Since 1983, Mississippi has had a moratorium on issuing new home health care licenses. In 1995, the only method of establishing a new home health care agency business in Mississippi was to purchase the license of an existing licensed home health care agency. Although several bills have been introduced in the Mississippi legislature to lift the moratorium, none has ever been enacted. Michael Vincent, the chief executive officer of the Sta-Home corporations, had personally contacted members of the Mississippi legislature to urge them not to lift the moratorium. He also had urged others to ask the Mississippi legislators not to lift the moratorium. From 1986 to 1993, the home health care business in Mississippi increased 340 percent (as compared to doubling nationally), but no new home health care agencies had entered that State.

In 1995, the Sta-Home tax-exempt entities ranked first or second in market share in 14 of the 19 counties in their service area. "Sta-Home" was a recognized name in home health care in

Mississippi, and it had a generally good reputation among Mississippi's elderly population.  In 1993, the Sta-Home tax-exempt entities were the first freestanding agencies in Mississippi to become accredited by the Joint Commission on Accreditation of Healthcare Organizations (JCAHO).  JCAHO accreditation required achieving or exceeding certain regulatory standards, including conditions as to the quality of patient care.  During 1995, the Sta-Home tax-exempt entities provided 834,596 home health care visits, and over 95 percent of the entities' services were to Medicare beneficiaries.  The Sta-Home tax-exempt entities also had several manuals that they had developed in-house regarding policies and procedures, including personnel, nursing, home health aid, physical therapy, and social work manuals.

It was generally recognized that under the Medicare reimbursement system in place in 1995, there was no ability for home health agencies to realize profits beyond costs and that the reimbursement system provided little incentive for providing services efficiently.  This situation prevailed because Medicare reimbursed a home health agency only for "allowable" costs at its discretion.  Therefore, any denied claim for reimbursement produced a cash outflow to the business.  The Sta-Home tax-exempt

entities generated gradually increasing revenue, but also
commensurate losses, in the 3 years preceding October 1, 1995.

The Sta-Home tax-exempt entities' accounting firm prepared
unaudited combined financial statements.  The results from
operations reported by the combined Sta-Home tax-exempt entities
on their returns for fiscal years ended September 30, 1991
through 1995, were:

| Year | Revenue | Expenses | Net Income (Loss) |
|------|---------|----------|-------------------|
| 1991 | $11,736,061 | $11,799,721 | ($63,660) |
| 1992 | 18,442,072 | 18,414,315 | 27,757 |
| 1993 | 25,162,701 | 25,208,255 | (45,554) |
| 1994 | 36,882,957 | 37,141,686 | (258,729) |
| 1995 | 44,101,849 | 44,535,239 | (433,390) |

According to those combined financial statements, the total
assets and liabilities of the Sta-Home tax-exempt entities for
those years were:

| Year | Assets | Liabilities | Deficit |
|------|--------|-------------|---------|
| 1991 | $3,203,759 | $3,787,285 | ($583,526) |
| 1992 | 5,404,925 | 5,960,696 | (555,771) |
| 1993 | 6,910,710 | 7,639,855 | (729,145) |
| 1994 | 7,515,492 | 8,417,027 | (901,535) |
| 1995 | 10,736,407 | 12,144,655 | (1,408,248) |

To ease their financial statuses, the Sta-Home entities
required their employees--including the Caracci family members
themselves--to forgo payment for the first 6 weeks of employment.
After that initial period, the employees were entitled to collect

a paycheck for 2 weeks' work.  The 4 weeks' initial earnings were withheld until the employees left the companies.

The Sta-Home tax-exempt entities had a policy of giving its employees discretionary bonuses.  For the pay period ended December 12, 1994, the entities paid bonuses totaling $966,204 to all personnel with the exception of new hires.  On April 10, 1995, the entities also approved for the directors bonuses of 15 percent.  For the pay period ended June 23, 1995, the entities approved additional bonuses totaling $664,116.  On September 29, 1995, the entities approved further bonuses totaling $2,314,086; this bonus created a $2,314,086 liability that was assumed by the Sta-Home for-profit entities incident to the asset transfer.

Mississippi historically reports the lowest per capita income of any State with corresponding high unemployment and low education levels.  An official Mississippi State Health Plan, prepared in 1995, indicated that poorly educated, low-income, and ill-housed people often had greater health care needs than other members of society.  The socioeconomic characteristics of the Sta-Home tax-exempt entities' service territory produced a higher use of home health care services in comparison to other areas of the country.  In 1992, Medicare paid an average of $13,432 per Mississippi patient, ranking the State highest in Federal payments per recipient among all States.  During 1994 and 1995,

95 percent of all visits made by home health agencies operating in Mississippi were paid for by Medicare.

During 1994 and 1995, the prospect arose of Medicare's shifting from a PIP cost reimbursement system to a prospective payment system (PPS). Several groups discussed the proposal in theory, but no one knew exactly what form PPS might take. The Sta-Home tax-exempt entities, through Vincent Caracci, an attorney whose job included keeping abreast of current events, learned of these proposed changes. Petitioners came to understand that the Sta-Home tax-exempt entities would not under a PPS receive a check every 2 weeks but would have to file a claim for every service rendered and wait for the claim to be processed and paid. Petitioners became concerned about the lack of cashflow under a PPS. They also believed that a PPS would reduce the Sta-Home tax-exempt entities' income.

Late in December 1994, the Caracci family consulted an attorney named Thomas Kirkland (Kirkland) about converting the Sta-Home tax-exempt entities into for-profit corporations. Kirkland's firm represented many home health care agencies, and he had recommended that all of those agencies make such a conversion. Kirkland's recommendation was based, in part, on his discussions with bankers who were reluctant to lend money to nonprofit home health care agencies. By 1991, petitioners'

regular accountant, Danny Hart (Hart), also recommended that the Sta-Home tax-exempt entities convert to nontax-exempt status.

Kirkland retained a tax attorney named James Pettis (Pettis) to help Kirkland convert the Sta-Home tax-exempt entities into for-profit entities. Subsequently, Pettis learned that Kirkland's firm had not obtained an appraisal for any of its previous conversions. Pettis informed Kirkland that Pettis "strongly [disagreed]" with that approach. By letter dated July 7, 1995, Kirkland's firm retained Hart's accounting firm to appraise the Sta-Home tax-exempt entities' net assets as of a proposed transaction date of October 1, 1995.

The appraisal was slow in coming. Pettis, the tax adviser, insisted on seeing the appraisal before proceeding with any transaction that would effect a conversion. After reading the appraisal, Pettis was concerned that it failed to deal with issues concerning intangible assets. He believed that the mere fact that an entity had lost money or had a negative cashflow did not mean that the entity was worthless. He also was concerned that the appraisal failed to address Rev. Rul. 59-60, 1959-1 C.B. 237, where the Commissioner has set forth standards on valuation for Federal income tax purposes. Upon Pettis's request, he received a second appraisal. Because some of his concerns as to intangible assets remained after reading the second appraisal, he

sought and received assurance that the Sta-Home tax-exempt entities' liabilities far exceeded the value of their assets and that the value of the intangibles would not give the entities a positive fair market value.

On July 11, 1995, the Sta-Home tax-exempt entities' boards of directors authorized the conversion of those entities into S corporations. The S status was chosen so that the shareholders could deduct the new entities' future losses. On August 22, 1995, in anticipation of a transfer of the Sta-Home tax-exempt entities' assets, Kirkland's firm, with petitioners' approval, formed the Sta-Home for-profit entities under Mississippi law. Each of those corporations subsequently elected to be taxed as an S corporation for Federal income tax purposes. Since their formation, the only shareholders of each of the Sta-Home for-profit entities have been Joyce Caracci (17.5 percent), Victor Caracci (17.5 percent), Michael Caracci (30 percent), Christina McQuillen (17.5 percent) and Vincent Caracci (17.5 percent). The only directors and officers have been members of the Caracci family.

On August 28, 1995, Hart's accounting firm tendered an appraisal stating that the value of the Sta-Home tax-exempt entities' assets was less than their liabilities. Kirkland had assumed that this would be the case. On September 1, 1995,

Kirkland executed and filed on behalf of each of the Sta-Home tax-exempt entities "Notices of Intent to Change Ownership" with the State of Mississippi Department of Health.

Effective October 1, 1995, Sta-Home Home Health Agency, Inc., transferred all of its tangible and intangible assets to Sta-Home Health Agency of Jackson, Inc., Sta-Home Home Health Agency, Inc., of Forest, Mississippi, transferred all of its tangible and intangible assets to Sta-Home Health Agency of Carthage, Inc., and Sta-Home Home Health Agency, Inc., of Grenada, Mississippi, transferred all of its assets to Sta-Home Health Agency of Greenwood, Inc.  The consideration paid by each transferee was the assumption of the related transferor's liabilities.  Since the transfers, the transferors have not engaged in any activities, charitable or otherwise, nor have they been dissolved under Mississippi law.

On October 19, 1995, Robert Crowell, Hart's accounting partner, sent a letter to Kirkland setting forth several reasons that Sta-Home should convert to a profit corporation from a nonprofit.  These included the need to raise capital and/or enter into profit-making ventures, in view of the past losses and accumulated deficit; the ability to participate in major changes taking place in the health care industry, including mergers and acquisitions; the provision of ownership interests for succession

plans to keep key management in place; and the ability to deal with changes in the reimbursement system within the near future. Four days later, the documents were executed that constitute the contract under which all of the transferors' assets were transferred to the transferees.

Other than State and Federal filing requirements and the slight changes in the names of the entities, the Sta-Home operations remained the same after the transfer as they were before. The Sta-Home for-profit entities continued to use a fiscal year ending on September 30 for financial accounting and Medicare reporting purposes, although not for tax purposes. As part of the transfers, the Sta-Home for-profit entities accepted assignment of the Sta-Home tax-exempt entities' Medicare provider agreements and continued to use the provider numbers of the Sta-Home tax-exempt entities. The Sta-Home for-profit entities continued to receive PIP payments and lump-sum settlements from the Medicare program, including quarterly payments based on quarterly PIP reports. The Sta-Home for-profit entities received a net preacquisition payment relating to settlement of the Sta-Home tax-exempt entities' 1987 fiscal year. Substantially, the same employees continued to do the same work, and the same assets were used in the same three locations. The Caracci family members continued to be employed by the Sta-Home for-profit

entities in the same positions in which they were employed by the Sta-Home tax-exempt entities, and each member's compensation and employment benefits remained subject to review by HCFA through the cost reporting process.  The 1995 and 1996 combined salaries paid to Joyce Caracci, Michael Caracci, Vincent Caracci, and Christina McQuillen[5] by the Sta-Home entities were as follows:

| Individual | 1995 | 1996 |
|---|---|---|
| Joyce Caracci | $140,472 | $141,685 |
| Michael Caracci | 226,483 | 232,686 |
| Vincent Caracci | 70,180 | 65,434 |
| Christina McQuillen | 64,514 | 55,952 |

The mid-1990's showed significant growth in the home health care industry.  Natl. expenditures for home nursing care grew from $3.8 billion in 1990 to $20.5 billion in 1997.  There was also substantial activity in home health care agency acquisitions.  There were 42 such acquisitions in 1994, 60 in 1995, 112 in 1996, and 139 in 1997.

During 1995, the primary buyers of home health agencies were hospitals, nursing homes, and other home health agencies.  They were able to take advantage of a mechanism known as "cost-shifting".  This attribute enabled a buyer such as a hospital (which generally received reimbursement under the PPS) to shift some of its costs to a cost reimbursement system for payment by

---

[5] Victor Caracci was paid on a consulting basis that varied significantly from year to year.

the Medicare program.  Cost shifting was possible because:
(1) The purchased home health care agencies had room under their cost cap because they had sought less than the maximum reimbursement allowed by Medicare and (2) Medicare reimbursed home health care providers for costs, such as overhead, that were not directly related to home visits.  Hospitals and nursing homes could benefit by acquiring a home health care agency and shifting some of their overhead costs to that agency to the extent that there was room under its cost cap.

During 1994 and 1995, a number of home health agencies in Mississippi were sold.  The State Board of Health identified 11 such acquisitions.  Seven were by hospitals; two were by home health care agencies; one was by an individual from a bankruptcy trustee, and one was a corporate reorganization.  All of the acquisitions by hospitals involved home health agencies in or near Mississippi, although on occasion the corporate headquarters of the acquiring corporations were located outside Mississippi. In 1995, the Deaconess Hospital Corp. of Cincinnati, Ohio, acquired the stock of Southern Mississippi Home Health, Inc., a Mississippi corporation.

Home health agencies remained under a cost reimbursement system until September 30, 1999, when legislation passed by Congress in 1997 providing a PPS for home health agencies took

full effect.  HCFA encountered problems implementing the system, and it was not finally implemented until October 1, 2000.

OPINION

I.  Introduction

Respondent has determined that petitioners' participation in the asset transfer made them liable for deficiencies totaling $256,114,435.[6]  Respondent's determination rests on his expert's determination that the fair market value of the transferred assets exceeded the assumed liabilities by approximately $20 million.  Petitioners argue that the assumed liabilities exceeded the fair market value of the transferred assets.  Petitioners rely on their expert, who concluded similarly.  It is with this backdrop that we proceed to decide the assets' value at the time of the transfer.  We bear in mind the wide difference in values ascertained by the experts.

II.  Fair Market Value

A.  Overview

A determination of fair market value is factual, and a trier of fact must weigh all relevant evidence of value and draw

---

[6] Of course, were the respondent to prevail in full, he would be entitled to only $46,460,477 of approximately $256,114,435.  The lion's share of the $256,114,435 is attributable to excise taxes under sec. 4958(a)(1) and (2) and (b) totaling $41,753,311 ($4,635,923 + $30,000 + $37,087,388), for all or part of which respondent has determined that eight petitioners are jointly and severally liable.

appropriate inferences.  Commissioner v. Scottish Am. Inv. Co.,
323 U.S. 119, 123-125 (1944); Helvering v. Natl. Grocery Co.,
304 U.S. 282, 294 (1938); Zmuda v. Commissioner, 79 T.C. 714, 726
(1982), affd. 731 F.2d 1417 (9th Cir. 1984); Mandelbaum v.
Commissioner, T.C. Memo. 1995-255, affd. without published
opinion 91 F.3d 124 (3d Cir. 1996).  Fair market value is the
price that a willing buyer would pay a willing seller, both
persons having reasonable knowledge of all relevant facts and
neither person being under any compulsion to buy or to sell.
United States v. Cartwright, 411 U.S. 546, 551 (1973); Kolom v.
Commissioner, 644 F.2d 1282, 1288 (9th Cir. 1981), affg. 71 T.C.
235 (1978); Estate of Hall v. Commissioner, 92 T.C. 312, 335
(1989).  See generally Rev. Rul. 59-60, 1959-1 C.B. 237.  The
willing buyer and the willing seller are hypothetical persons,
rather than specific individuals or entities, and the
characteristics of these hypothetical persons are not necessarily
the same as the personal characteristics of the actual seller or
a particular buyer.  Propstra v. United States, 680 F.2d 1248,
1251-1252 (9th Cir. 1982); Estate of Bright v. United States,
658 F.2d 999, 1005-1006 (5th Cir. 1981); Estate of Jung v.
Commissioner, 101 T.C. 412, 437-438 (1993); Mandelbaum v.
Commissioner, supra.

Fair market value reflects the highest and best use of the
relevant property on the valuation date and takes into account

special uses that are realistically available because of the property's adaptability to a particular business. <u>Mitchell v. United States</u>, 267 U.S. 341, 344-345 (1925); <u>Symington v. Commissioner</u>, 87 T.C. 892, 896 (1986); <u>Stanley Works v. Commissioner</u>, 87 T.C. 389, 400 (1986); <u>Estate of Proios v. Commissioner</u>, T.C. Memo. 1994-442. Fair market value is not affected by whether the owner has actually put the property to its highest and best use. The reasonable and objective possible uses for the property control the valuation thereof. <u>United States v. Meadow Brook Club</u>, 259 F.2d 41, 45 (2d Cir. 1958); <u>Stanley Works v. Commissioner</u>, <u>supra</u> at 400. The hypothetical willing buyer and seller are presumed to be dedicated to achieving the maximum economic advantage, <u>Estate of True v. Commissioner</u>, T.C. Memo. 2001-167, and the "hypothetical sale should not be construed in a vacuum isolated from the actual facts", <u>Estate of Andrews v. Commissioner</u>, 79 T.C. 938, 956 (1982).

Here, the parties dispute whether any value should be given to the Sta-Home tax-exempt entities' cost-shifting attribute. Cost-shifting could attract prospective purchasers, such as hospitals, that desired to acquire a home health care agency and use its cost-shifting capacity. At our request, the parties have discussed whether attributing value to this mechanism is consistent with the requirement that fair market value be

determined using a "hypothetical" buyer.  We conclude that it is.
A hypothetical buyer may be one of a class of buyers who is
positioned to use the purchased assets more profitably than other
entities.  Accordingly, we have held that fair market value takes
into account special uses that are realistically available
because of a property's adaptability to a particular business.
Stanley Works v. Commissioner, supra at 400.  Acknowledging the
existence of such businesses in the universe of hypothetical
buyers also is consistent with the standard that assets are not
valued in a vacuum but, instead, are valued at their highest and
best use.

The cases petitioners cite do not require a different
conclusion.  The cases of Morrissey v. Commissioner, 243 F.3d
1145 (9th Cir. 2001), revg. and remanding Estate of Kaufman v.
Commissioner, T.C. Memo. 1999-119, Estate of Andrews v.
Commissioner, supra, and Estate of Magnin v. Commissioner, T.C.
Memo. 2001-31, stand for the proposition, which we accept, that
the attributes of a hypothetical willing buyer cannot be limited
to those of a particular buyer.  That proposition is inapplicable
where, as here, we do not confine the hypothetical buyer to a
specific and identifiable buyer but include the entire class of
buyers for whom the Sta-Home tax-exempt entities' cost-shifting
attributes could be especially adaptable.  Stanley Works v.
Commissioner, supra.

Nor are petitioners assisted by citing Estate of Davis v. Commissioner, 110 T.C. 530 (1998). There, we rejected the Commissioner's attempt to narrow the field of hypothetical willing buyers. The Commissioner had done so by advancing the unwarranted assumption that a hypothetical buyer would cause the acquired corporation to escape its potential tax liabilities by having it elect S corporation status and by not permitting it to sell any of its assets for 10 years thereafter. Unlike the assumption there, the assumption here that the cost-shifting attribute is a valuable asset is fully warranted. In fact, as explained below, both experts have ascribed value to the Sta-Home tax-exempt entities' cost-shifting mechanism. In addition, petitioners' expert, Alfred D. Hahn (Hahn), has elsewhere written that "transaction prices reflect the value to a buyer to shift overhead costs". Hahn et al., "Home Health Agency Valuation: Opportunity Amid Chaos", Intrinsic Value (Spring 1998).

B. Role of the Expert

As typically occurs in a case of valuation, each party relies primarily upon an expert's testimony and report to support the respective positions on valuation. A trial judge bears a special gatekeeping obligation to ensure that any and all expert testimony is relevant and reliable. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999); Daubert v. Merrill Dow Pharm., Inc., 509 U.S. 579, 589 (1993).

The Court has broad discretion to evaluate the cogency of an expert's analysis.  Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 85 (2000).  Sometimes, an expert will help us decide a case.  E.g., Booth v. Commissioner, 108 T.C. 524, 573 (1997); Trans City Life Ins. Co. v. Commissioner, 106 T.C. 274, 302 (1996); see also M.I.C., Ltd. v. Commissioner, T.C. Memo. 1997-96; Estate of Proios v. Commissioner, supra.  Other times, he or she will not.  E.g., Estate of Scanlan v. Commissioner, T.C. Memo. 1996-331, affd. without published opinion 116 F.3d 1476 (5th Cir. 1997); Mandelbaum v. Commissioner, T.C. Memo 1995-255 Aided by our common sense, we weigh the helpfulness and persuasiveness of an expert's testimony in light of his or her qualifications and with due regard to all other credible evidence in the record.  Neonatology Associates, P.A. v. Commissioner, supra at 85.  We may embrace or reject an expert's opinion in toto, or we may pick and choose the portions of the opinion to adopt.  Helvering v. Natl. Grocery Co., 304 U.S. at 294-295; Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; IT & S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991); see also Pabst Brewing Co. v. Commissioner, T.C. Memo. 1996-506.  We are not bound by an expert's opinion and will reject an expert's opinion to the extent that it is contrary to the judgment we form on the basis of our understanding of the record as a whole.  Orth v.

*Commissioner*, 813 F.2d 837, 842 (7th Cir. 1987), affg. <u>Lio v. Commissioner</u>, 85 T.C. 56 (1985); <u>Silverman v. Commissioner</u>, <u>supra</u> at 933; <u>IT & S of Iowa, Inc. v. Commissioner</u>, <u>supra</u> at 508; <u>Chiu v. Commissioner</u>, 84 T.C. 722, 734 (1985).

Here, the experts began by observing that the methodology traditionally used in business appraisals includes an income approach, a cost approach, and a market approach. In an income approach, value depends upon the present value of future economic benefits to be derived from ownership. An enterprise's price-per-share value is then estimated by discounting the net cashflows available for distribution back to their present value, at market-based rates of return. The cost approach uses estimates of current costs to replace the enterprise's fixed assets and certain intangible assets. The market approach establishes the value of a privately held corporation through analyses of sales or transfers of guideline companies. The information derived from this analysis is then used to form an opinion of market value for a subject company.

C. <u>Expert Testimony for Petitioners</u>

To support their contention that the value of the Sta-Home tax-exempt entities' assets was less than the liabilities assumed, petitioners rely upon the report and testimony of Hahn. Hahn, a director in PricewatershouseCoopers Northeast Region Corporation Valuation Consulting Group, has written extensively

on the valuation of home health care agencies and has frequently appeared as an expert witness.

Hahn started by noting that because of the predominance of Medicare in the payor mix of most home health agencies, a conventional cashflow or earnings approach to valuation would produce "a very different result from other, more appropriate approaches." This is so because home health agencies, with a preponderance of Medicare-eligible patients, earn little if any profit.[7]

Hahn instead relied principally upon an "Adjusted Balance Sheet" methodology, a form of the cost approach. That methodology restates a company's accounting balance sheet to its fair market value equivalent. Hahn explained that this approach involves the identification and valuation of tangible and intangible assets and liabilities, whether or not they appear on the subject company's accounting balance sheet.

Hahn started with the unaudited balance sheets prepared by petitioners' accounting firm in 1995. He concluded that several of the Sta-Home tax-exempt entities' asset accounts required revaluation. He noted that there were several "unrecorded

[7] The evidence includes an article written by Hahn wherein he reports that his firm's database reflects that "more than 75 percent of home health agency acquisitions involved agencies that recorded losses." Hahn, "Payment Reform Will Shift Home Health Agency Valuation Parameters", Healthcare Financial Management (Dec. 1998).

material assets and liabilities" in addition to the assets and liabilities on the balance sheets. In terms of the assets, he indicated that economic intangible assets should be adjusted to fair market value. He also included some liabilities that were not recorded on the unaudited balance sheet, such as a balance due to Medicare from the Jackson and Grenada facilities for the fiscal year 1993. He further made allowance for pending events which, he opined, suggested the possibility of future claims against the companies, such as a reserve for future downward reimbursement adjustments by Medicare.

Hahn observed that the passage of time had obscured the then-current value of the companies because the analysis was prepared 5 years after the actual transaction. Accordingly, Hahn prepared both a "base case" and a "best case" scenario to develop a range of fair market values. He concluded that the fair market value of the Sta-Home tax-exempt entities' total tangible and intangible assets was between $10.5 million and $11.5 million. He noted that the entities' total recorded and contingent liabilities were between $12 million and $12.5 million. His result indicates that the combined liabilities of the Sta-Home tax-exempt entities exceeded the value of their assets by $.5 million to $2 million.

The following tables set forth Hahn's "base case" and "best case" adjusted balance sheets. The first figure column lists the

unaudited balance sheets for the fiscal year ended September 30,

1995.  The next column (PwC Valuation Adjustments) shows changes

made by Hahn.  The last column shows Hahn's estimate of the fair

market value of each category after making his changes.

Valuation of Sta-Home Agency, Inc. - Combined
Adjusted Balance Sheet Approach
Valuation Performed as of 9/30/95

Best Case Scenario

| | Compiled FYE 9/30/95 | PwC Valuation Adjustments | Fair Market Value FYE 9/30/95 |
|---|---|---|---|
| Cash | $1,271,031 | -- | $1,271,031 |
| Accounts receivable | 9,115,026 | ($857,786) | 8,257,240 |
| Allowance for contractual adjustments | (4,205,058) | 274,701 | (3,930,357) |
| Allowance for bad debts | -- | (264,444) | (264,444) |
| Est. third-party payor settlements--Medicare | 2,269,063 | (295,473) | 1,973,590 |
| Allowance for unsuccessful claims | -- | (543,803) | (543,803) |
| Accounts receivable--employees | 51,518 | -- | 51,518 |
| Accounts receivable--other | 96,820 | -- | 96,820 |
| Prepaid expenses | 656,465 | -- | 656,465 |
| Total current assets | 9,254,865 | -- | 7,568,060 |
| | | | |
| Property, plant & equipment | 2,850,538 | -- | 2,850,538 |
| Accumulated depreciation | (1,456,464) | -- | (1,456,464) |
| Total PP&E | 1,394,074 | -- | 1,394,074 |
| | | | |
| Deposits | 9,033 | -- | 9,033 |
| Long-term accounts receivable--other | 78,435 | (59,610) | 18,825 |
| Total other assets | 87,468 | -- | 27,858 |
| | | | |
| Workforce-in-place | -- | 2,100,000 | 2,100,000 |
| Cost-shifting capacity | -- | 667,467 | 667,467 |
| Total intangible assets | -- | -- | 2,767,467 |
| | | -- | |
| Total assets | 10,736,407 | | 11,757,459 |
| | | | |
| Current portion of long-term debt | 369,967 | -- | 369,967 |
| Accounts payable | 750,199 | -- | 750,199 |
| Accounts payable--other | 165,808 | -- | 165,808 |
| Accrued payroll | 5,009,968 | -- | 5,009,968 |
| Accrued payroll taxes | 1,141,431 | -- | 1,141,431 |
| Other accrued expenses | 4,206,978 | -- | 4,206,978 |
| Due to Medicare | -- | 201,000 | 201,000 |
| Total current liabilities | 11,644,351 | -- | 11,845,351 |
| | | | |
| Notes payable, long-term portion | 500,304 | -- | 500,304 |
| | | | |
| Total liabilities | 12,144,655 | -- | 12,345,655 |
| | | | |
| Liabilities in excess of assets | (1,408,248) | -- | (588,196) |

Valuation of Sta-Home Agency, Inc. - Combined APPENDIX C
Adjusted Balance Sheet Approach
Valuation Performed as of 9/30/95

Base Case Scenario

| | Compiled FYE | PwC Valuation | Fair Market Value FYE |
|---|---|---|---|

|  | 9/30/95 | Adjustments | 9/30/95 |
|---|---|---|---|
| Cash | $1,271,031 | -- | $1,271,031 |
| Accounts receivable | 9,115,026 | ($1,072,232) | 8,042,794 |
| Allowance for contractual adjustments | (4,205,058) | 274,701 | (3,861,682) |
| Allowance for bad debts |  | (142,885) | (142,885) |
| Est. third-party payor settlements--Medicare | 2,269,063 | (295,473) | 1,973,590 |
| Allowance for unsuccessful claims |  | (1,087,606) | (1,087,606) |
| Accounts receivable--employees | 51,518 | -- | 51,518 |
| Accounts receivable--other | 96,820 | -- | 96,820 |
| Prepaid expenses | 656,465 | -- | 656,465 |
| Total current assets | 9,254,865 | -- | 7,000,045 |
| Property, plant & equipment | 2,850,538 | -- | 2,850,538 |
| Accumulated depreciation | (1,456,464) | -- | (1,456,464) |
| Total PP&E | 1,394,074 | -- | 1,394,074 |
| Deposits | 9,033 | -- | 9,033 |
| Long-term accounts receivable--other | 78,435 | (59,610) | 18,825 |
| Total other assets | 87,468 | -- | 27,858 |
| Workforce-in-place | -- | 2,100,000 | 2,100,000 |
| Total intangible assets | -- | -- | 2,100,000 |
| Total assets | 10,736,407 | -- | 10,521,977 |
| Current portion of long-term debt | 369,967 | -- | 369,967 |
| Accounts payable | 750,199 | -- | 750,199 |
| Accounts payable--other | 165,808 | -- | 165,808 |
| Accrued payroll | 5,009,968 | -- | 5,009,968 |
| Accrued payroll taxes | 1,141,431 | -- | 1,141,431 |
| Other accrued expenses | 4,206,978 | -- | 4,206,978 |
| Due to Medicare | -- | 201,000 | 201,000 |
| Total current liabilities | 11,644,351 | -- | 11,845,351 |
| Notes payable, long-term portion | 500,304 | -- | 500,304 |
| Unaudited cost reports | -- | (517,909) | 517,909 |
| Total liabilities | 12,144,655 | (718,909) | 12,863,564 |
| Liabilities in excess of assets | (1,408,249) | (933,338) | (2,341,587) |

To corroborate his findings of net asset value, Hahn used a market-transaction approach. This approach involved valuing the Sta-Home tax-exempt entities on the basis of market values of comparable companies that had been sold. To Hahn, the comparable approach was only a secondary indication of value, because sales of other individual home health care agencies appeared to be too "idiosyncratic" to provide a principled basis for valuation. In any event, Hahn noted that approximately 50 applications to change ownership had been filed by home health care agencies in

Mississippi during the 11-year period ended in 1995.  Little information was available as to these ownership changes, and Hahn found only two guideline transfers.

Hahn further noted that the Sta-Home tax-exempt entities were focused almost entirely upon traditional home health care and depended almost entirely upon Medicare payments.  Publicly traded companies, by contrast, usually utilized traditional home health care agencies as part of a broader mix of health care business.  Hahn concluded, therefore, that a comparison to publicly traded companies would not be appropriate to value the Sta-Home tax-exempt entities, and he instead utilized "readily available" information on 13 comparable sales derived from privately held transactions engaged in by those publicly traded companies.  From these privately held transactions, Hahn excluded sales of privately held home health agencies that provided sophisticated "infusion or respiratory therapy" because those could attract reimbursement at a higher rate than those available to the more traditional home health care agencies such as Sta-Home.

Principally upon the basis of his adjusted balance sheet and comparable market computations, Hahn reached an ultimate conclusion that the Sta-Home tax-exempt entities' liabilities exceeded their total tangible and intangible assets by $600,000 to $2,350,000.

Finally, Hahn turned his attention to making adjustments to the Sta-Home for-profit entities' stock for "control premiums" and lack of marketability. He hypothecated that no additional premium for control of the Sta-Home tax-exempt entities was appropriate because the sale of 100 percent of the Sta-Home tax-exempt entities was contemplated (therefore, all of the value of the companies would be included in the transaction price). He also concluded that any adjustment to reflect the fact that Mississippi presented an unattractive market for the sale of the Sta-Home tax-exempt entities had been incorporated into his adjusted balance sheet valuation.

With respect to the value of the stock held by the individual shareholders, Hahn noted that no one individual could control the Sta-Home tax-exempt entities. While he believed that this usually would require that a minority discount be reflected in the value of the shares held by the noncontrolling shareholders, he concluded that a minority discount was not appropriate here because the shares represented equity interests in a loss corporation. He noted, however, that at the time of the asset transfer the appropriate control premium and market discount in the home health care industry were approximately 36 percent and 26 percent, respectively.

D. Expert Testimony for Respondent

Charles A. Wilhoite (Wilhoite) presented expert testimony on behalf of respondent. Wilhoite, a certified public accountant, is a principal of Willamette Management Associates and codirector of that firm's office in Portland, Oregon. He has performed a number of assignments involving the analysis and appraisal of professional practices, with a heavy concentration in the health care field. He has been involved with assignments requiring the valuation of intangible assets, including CONs, customer relationships, goodwill, and workforces.

Petitioners argue that Wilhoite's testimony should be stricken because, they claim, his qualifications as an expert and his methodology are insufficient to meet the standards set forth in Daubert v. Merrill Dow Pharm., Inc., 509 U.S. 579 (1993). These contentions are nonsensical and border on the frivolous. Gross v. Commissioner, T.C. Memo. 1999-254, affd. 272 F.3d 333 (6th Cir. 2001). We have no reason to question our recognition of Wilhoite as an expert on the fair market valuation of health industry and related businesses; i.e., the business of the Sta-Home tax-exempt entities. Nor are we unsatisfied as to the reliability of his methodology, including ascertaining the fair market values of invested capital for comparable entities. BTR Dunlop Holding, Inc. v. Commissioner, T.C. Memo. 1999-377.

Turning to Wilhoite's testimony, Wilhoite, like Hahn, considered the three principal means of valuing a company's

assets; i.e., the income, cost, and market approaches. Wilhoite rejected the cost approach as a means of valuing the Sta-Home tax-exempt entities. He noted that the value of the Sta-Home tax-exempt entities' intangible assets was especially important because the entities were service-based business with a relatively low investment in tangible assets. He noted that the Sta-Home tax-exempt entities' intangible assets included operating licenses, Medicare certifications, patient lists, referral relationships, a trained and assembled workforce, proprietary policies and procedures and trade name, and a going concern value. He noted that the CONs had been subject to a moratorium for the 12 years prior to the valuation date. He noted that "health issues" prevented him from learning details about the Sta-Home tax-exempt entities' intangible assets from the Sta-Home tax-exempt entities' management and that much of that information was simply not available.

He explained that several of the home health care agencies acquired in recent transactions had incurred losses immediately before their sale. He observed, however, that the purchasers of those agencies still had paid considerable amounts to acquire them. To Wilhoite, this factor indicated that the intangible assets even of companies that showed losses were worth considerable sums to potential acquirers. Moreover, it indicated to Wilhoite that an examination of similar acquisitions would

result in an indication of a value which included the value of intangible assets.

Wilhoite decided that a better valuation would come from employing the market approach; i.e., examining transfers of ownership of comparable home health care agencies. His market approach utilized two types of transfers. One involved the valuation of comparable publicly traded home health care agencies. The other valued the consideration paid for merged or acquired companies. In addition to the two-pronged market approach, Wilhoite also utilized an income method, wherein he calculated the value of the Sta-Home tax-exempt entities' cost-savings attribute to a potential buyer.

As a basis for his valuations under both the market and income approaches, Wilhoite ascertained the market value of invested capital (MVIC) for the Sta-Home tax-exempt entities. The MVIC represents the market value of a company's capital structure--all of its ownership equity and all of its interest-bearing debt. The MVIC method is commonly used in the valuation of closely held companies. Its use operates to minimize differences in capital structure between a closely held company and publicly traded companies which are used as comparables. See Pratt et al., Valuing Small Business and Professional Practices 548 (3d ed. 1998).

Wilhoite turned first to the market approach, examining the value of publicly traded companies that operated home health care agencies. For each of these, he ascertained a "revenue pricing multiple"; i.e., a percentage that when multiplied by the annual revenues of a home health care agency would reflect the MVIC of that agency. The MVIC of the comparable companies reflected a median revenue multiple of .61. Because Sta-Home tax-exempt entities were nonprofit companies, however, their returns on invested capital were considerably lower. Wilhoite selected a multiple of .3, noting that this multiple represented a discount of 50 percent from the median guideline company multiple. He then multiplied .3 times the Sta-Home tax-exempt entities' 1995 revenues of $45,209,000 to arrive at an MVIC for the Sta-Home tax-exempt entities of $13,563,000.

Wilhoite next turned his attention to the guideline merged and acquired company method. He examined figures available from publications such as the "Home Health Care M&A Report" published by Irving Levin Associates, Inc. He pointed out that two of the comparable merged or acquired companies were very close in revenues to the Sta-Home tax-exempt entities; of those two, the MVIC of Patient-Care, Inc., represented a revenue multiple of .40, and the MVIC of Magellan Health Services, Inc., reflected a revenue multiple of 1.08. With respect to a comparable company that operated at a loss, namely, Nurse-Care, Inc., Wilhoite noted

that when acquired, it had reported revenues of $15.3 million but overall losses of 1.9 percent. Nurse-Care, Inc., sold for an MVIC revenue multiple of .21. Taking these factors into consideration, Wilhoite selected a revenue multiple of .25 times the last year's revenue. This amount was approximately 20 percent higher than that of Nurse-Care, Inc., but 50 percent lower than the guideline for the median merged or acquired companies. Having applied the .25 multiple to the Sta-Home tax-exempt entities' last 12-month revenue of $45,209,000, Wilhoite arrived at an MVIC of $11,302,000.

Wilhoite then turned to the income approach. He ascertained that the Sta-Home tax-exempt entities could generate meaningful income for a purchaser that was positioned to use the cost-shifting strategy. An officer of Sta-Home tax-exempt entities had indicated to Wilhoite that the entities had historically received reimbursed costs in an amount that was 5 percent below the limit they were allowed. Wilhoite ascertained that the annual value of such a saving in 1995 was $1,408,168. To ascertain the present value of a stream of such payments, Wilhoite ascertained an appropriate multiplier by examining the weighted average cost of capital for Sta-Home tax-exempt entities, less the anticipated increases generated by long-term growth. Wilhoite arrived at a capitalization rate of 12.8 percent. This capitalization rate yielded a value for the Sta-

Home tax-exempt entities, on the basis of use of the cost gap, of $11,001,000.

To conclude his study, Wilhoite assigned a weighted percentage to each of the three values he had derived under the two market approaches and the single income approach. He gave the most weight to the income approach, somewhat less weight to the publicly traded comparable approach, and the least weight to the merged or acquired comparable approach. His weighted average was $11,604,000 for the MVIC. Wilhoite then took into account the fact that, although they were ongoing businesses, the Sta-Home tax-exempt entities had nevertheless generated a net working capital deficit; i.e., the current liabilities exceeded the current assets by more than $2 million. While sufficient current assets would usually be present in an ordinary operating business to pay for current liabilities, this was not the case for the Sta-Home tax-exempt entities. A purchaser would quickly have to come up with additional moneys to pay the bills. Wilhoite viewed the necessity for such a "working capital infusion" as a factor that would lower the value of the calculated MVIC. Thus, from the $11,604,000 value for the MVIC, he subtracted the $2,020,000 deficit that a buyer of the Sta-Home tax-exempt entities would have to provide following an acquisition of the companies.

To the resulting figure for the now-discounted MVIC, Wilhoite added the companies' current liabilities. He did so

because accounting rules require the asset side and the liability side of a company's balance sheet to be equal. His calculated MVIC, which comprised long-term liabilities and owners' equity, did not include current liabilities. Wilhoite reasoned that, by adding the known current liabilities to the MVIC, he would complete the liability side of the balance sheet. The asset sheet would thus be an amount that equaled the liabilities so computed. He compared the inclusion of current liabilities as a means of ascertaining value by showing that petitioners had done essentially the same operation. Their position was that the companies' value was equal to the total liabilities, both long-term and short-term debt. The difference between Wilhoite's view and that of petitioners is that Wilhoite concluded, on the basis of his MVIC analysis, that the companies had some value, which was expressed on the liabilities side as owners' equity. Petitioners, however, maintained that there was no owners' equity and, hence, they did not include it in the balance sheet. His explanation stated:

> Basic accounting requires that the total asset value of an entity (i.e., the "left-hand side" of the balance sheet) is equal to the sum of the total liabilities and equity, or net asset value, of an entity (i.e., the "right-hand side" of the balance sheet). * * * [The Sta-Home for-profit entities] and the Caraccis reported acquired all of the assets of the tax-exempt agencies by assuming all of the liabilities of the tax-exempt agencies. Because the Caraccis assumed no equity value existed, and because basic accounting requires that the

"left-hand side" of the balance sheet equal the "right-hand side", our independently determined estimate of the fair market value of Sta-Home's invested capital (i.e., interest-bearing debt and equity, reduced by the estimated working capital infusion) combined with reported current liabilities, provides the total "right-hand side" of the balance sheet.

The result is as follows:

| | |
|---|---|
| Indicated MVIC | $11,604,000 |
| Less working capital infusion | 2,020,000 |
| Plus current liabilities | 11,274,000 |
| Indicated asset value | 20,858,000 |

E.  Our Valuation of the Sta-Home Tax-Exempt Entities

The traditional determinants of fair market value persist even when valuing a nonprofit, tax-exempt company.  There are differences, however, in the amount of weight usually given to the earnings and profits of regular business organizations and those of tax-exempt entities.  Earnings and profits are obviously less meaningful in the case of nonprofit organizations.  Here, Medicare funded 95 percent of the Sta-Home tax-exempt entities' operations.  As applicable herein, the Medicare program was not designed to produce corporate profits nor to contribute to the capital growth of health care organizations.  It was designed to reimburse providers of home health care services for their costs, including administrative salaries and overhead.  The system nevertheless permitted the operators of such agencies to generate executive-level salaries and benefits for themselves.  It also permitted them to accumulate substantial assets in their businesses without paying income taxes on any of their earnings.

Petitioners urge that "common sense" requires a decision in their favor. They argue that they incurred losses, not gains, on the transactions leading to formation of the Sta-Home for-profit entities. They point to balance sheets which show that the liabilities they assumed exceeded the value of the assets they acquired.

We disagree with petitioners' so-called common sense rationale. To the contrary, we think it obvious that a company's negative book value does not require a finding that the company had a fair market value of less than zero. Nor does the fact that a company operates at a loss mean that its intangible assets have no value. Those assets are still capable of generating revenue, thus proving they have value. Even petitioners' tax adviser, Pettis, testified to that effect.

Moreover, the Sta-Home tax-exempt entities' assets generated revenues of approximately $45 million in the year they were transferred to the Sta-Home for-profit entities. The Sta-Home tax-exempt entities reported a modest income from operations, but, after deducting interest and depreciation (mostly for their fleet of automobiles), they reported a loss of $506,713. Although in 1995 they also reported an increase for the third consecutive year in the negative net asset value to a new total of $1,408,248, the evidence shows that their fourth employee bonus in that year amounted to some $2,314,086. Had they not

declared that bonus, they would have reported nontaxable income of approximately $1,785,000, or, in other words, more than enough to eliminate the accumulated deficit in net asset value.

The Sta-Home tax-exempt entities' expert also reported that their total payroll for 1995 was $34,600,000, or about 80.5 percent of operating expenses, and that this amount of employee compensation was "generous".  A common range of compensation for other home health care agencies was between 70 and 75 percent. Had petitioners not declared the last bonus, their compensation expense would have been $34,085,914, or 75.4 percent of operating expenses.  This amount would have exceeded the industry average and still enabled the companies to eliminate their accumulated deficit and show a modest profit.  Thus, even though the Sta-Home tax-exempt entities reported a history of losses, they at least had the potential to generate income and thus demonstrate a substantial fair market value.

We believe that the best evidence of the value of the Sta-Home tax-exempt entities arises from the use of the comparable value method employed by both experts.  We also are persuaded that the fair market value is best determined by relying upon the rationale of Wilhoite.  His use of the MVIC approach to compare the privately held Sta-Home tax-exempt entities to similar publicly traded businesses is especially appropriate here.  That approach harmonizes the differences between debt and equity usage

by publicly traded companies and privately held entities.  It also considers the total investment, which, as discussed <u>infra</u>, is especially important for the Sta-Home tax-exempt entities.

We do not agree, however, that Wilhoite ascertained an accurate price-to-revenue multiple for ascertaining the Sta-Home tax-exempt entities' MVIC.  His .3 multiplier was approximately half that applicable to the median of the publicly traded comparables.  His discount reflects petitioners' demonstration that many of these publicly traded companies functioned in areas where combinations of businesses, including managed care operations, produced more favorable prospects than were generally available in Mississippi.  Wilhoite's discount does not, however, sufficiently take into account the absence from the Sta-Home services of some of the more sophisticated, and remunerative, home health care techniques, such as infusion and respiratory therapies.  These techniques were utilized by many of the comparison companies.  We therefore believe that the price-to-revenue multiple for publicly traded companies should be no higher than the .25 that he applied to the merged and acquired comparable companies.

We also fail to find Wilhoite's valuation particularly meaningful solely on the basis of the capitalization of Sta-Home tax-exempt entities' intangible known as the "cost gap".  Wilhoite has correctly noted that the cost gap has substantial

potential value to a hospital purchaser, and, in fact, Hahn has written extensively about the value of this cost-shifting attribute. We feel, however, that Wilhoite has included too many imponderables in his calculation. For example, we do not believe that the entire value of the Sta-Home tax-exempt entities is appropriately bound up in the marketability of a single intangible asset--the cost gap. Nor do we believe that it is justified to conclude that the cost gap would produce economic benefits indefinitely, especially in view of the official scrutiny it had received before, and during, 1995. Finally, we observe that Wilhoite has assumed that the cost gap would equal 95 percent of the allowable cost ceiling (i.e., be 5 percent less than the ceiling). This percentage appears to have been accurate for earlier years, but the most recent cost gap was only 2.86 percent below the cost ceiling. The way for a potential buyer to increase the cost-gap percentage would be to reduce costs further. We do not think, however, that a buyer of the Sta-Home tax-exempt entities would necessarily decrease expenses to move the cost gap asset from its most recent 2.86-percent level back to historic 5-percent level and then continue this cost gap indefinitely. On balance, we believe that the most weight is properly given to Wilhoite's estimate of the MVIC for the Sta-Home tax-exempt entities, using a price-to-revenue multiple of .25. This results in an MVIC of $11.3 million.

Petitioners have raised a number of issues concerning the Sta-Home tax-exempt entities' MVIC, and we believe that one of their points has merit. Their principal contention arises from their concession that the Sta-Home tax-exempt entities' capital structure was "different". They explained that the entities' practice of requiring employees to forgo paychecks for the first 6 weeks created a pool of approximately $6.1 million. Although they identified this amount as a current liability in the form of accrued payroll and accrued payroll taxes, this permanent pool actually functioned as a source of permanent capital. To prove their point, they show that their reported current liabilities for 1995 were 108 percent of invested capital, an amount several times greater than that of comparable companies. In effect, they argue, their employees had made a collective long-term loan to the company. We agree. In operation, much of the $6.1 million which had been held back from the employees' payroll and payroll taxes functioned as a source of long-term financing.

Not all of the withheld payroll, however, is properly considered long-term financing. Petitioners' accountant, Hart, testified that the Sta-Home tax-exempt entities originally had a "two-week payroll" which was extended to 4 weeks, and then to 6 weeks, as a source of working capital. Hahn's report states that Medicare pays home health care agencies no less frequently than every 2 weeks based on estimated costs. To aid their cashflow

situation, the Sta-Home entities paid their employees 6 weeks in arrears. Thus, an employee was required to wait 6 weeks before getting his or her first paycheck, for 2 weeks' work. In the meantime, however, Medicare reimbursed the companies for the amount of accrued wages every 2 weeks. The entities thus received 6 weeks' worth of wages per employee before being required to pay out 2 weeks' worth. The deferral of actual payment meant, in effect, that each employee made a loan of 4 weeks' wages to the company, and the "loan" would not be repaid until the employee left his or her employment. When one employee left, another was presumably hired, and the new employee would be required to forgo 4 weeks' salary, thus keeping the total amount of deferrals relatively stable. By 1995, this practice had generated a "float" of approximately $4.1 million that the entities possessed and were not required to repay until some unspecified time in the future. It appears that 2 weeks' worth of payroll and payroll taxes is properly characterized as short-term liabilities. We conclude that the amounts of payroll that were withheld for longer than 2 weeks were not, in this case, properly characterized as current liabilities. For purposes of this valuation, they should be considered part of the invested capital. Accordingly, of the $6,150,000 withheld, two-thirds (or 4 weeks' worth) should be excluded from the current liabilities that Wilhoite added to the MVIC. Wilhoite based his calculation

of MVIC upon an informed estimate of the value of invested capital (i.e., long-term debt plus owner's equity) that would produce the known revenues. For 1995, his calculations showed that invested capital of $11.3 million would produce the reported $45,209,000 in revenue that the Sta-Home tax-exempt entities generated. Some part of this MVIC is readily discernible; it includes $500,000 of long-term debt. Additionally, as we have explained, it also includes the $4.1 million of deferred wages that functioned as long-term debt for the companies. As earlier observed, however, a buyer would have to include as part of the purchase price not only the value of the invested capital, the MVIC, but also the current liabilities that the purchased company would have to pay. Wilhoite accordingly added current liabilities of $11,475,000 from the Sta-Home tax-exempt entities' balance sheets to his calculated MVIC of $11.3 million. That amount of current liabilities, however, includes $4.1 million of withheld wages that operate as long-term debt and thus form part of the MVIC. To avoid duplicating this $4.1 million figure in arriving at a fair market value for the companies, we believe that it should be excluded from current liabilities. (Removing $4.1 million from current liabilities, however, also restores the $2,020,000 working capital shortfall resulting from the failure of current assets to match current liabilities. Accordingly, there is no longer a need to reduce the asset value by the amount

of the capital infusion.)  Finally, we also believe that current
liabilities should be increased by $201,000, as suggested by
Hahn, to reflect a reserve for disallowed claims on its Medicare
cost reports.  This increases the current liabilities to
$11,475,000, before deducting the amount of withheld payroll that
is to be considered part of the MVIC.

When we take these modifications into account, we arrive at
a fair market value of $18,675,000:

| | |
|---|---|
| Indicated MVIC | $11,300,000 |
| Plus current liabilities | 11,475,000 |
| Less withheld payroll | (4,100,000) |
| Indicated asset value | 18,675,000 |

We are unimpressed and unpersuaded by Hahn's conclusions as
to the fair market value of the Sta-Home tax-exempt entities, and
we have decided not to accept them.  His reasoning that the Sta-
Home tax-exempt entities had a fair market value of less than
zero is unconvincing, and, in fact, appears to be more an
advocacy of petitioners' litigating position than a candid fair
market appraisal.  We think a willing buyer would be puzzled and
confused by his conclusions.  Neither Hahn's "adjusted balance
sheet" approach nor his backup market approach justify the
finding of a negative net worth.

First, in one substantial respect, even Hahn's "best case"
adjusted balance sheet is seriously deficient.  Hahn's report
states:  "Most buyers concentrate on the intangible assets of a
home health agency."  His conclusions, however, fail to account

for much of the substantial value of the Sta-Home tax-exempt entities' intangible assets. Hahn ascertained a value for two intangible assets. He first developed a value for the Sta-Home tax-exempt entities' workforce in place of $2.1 million to $3.4 million. He used the $2.1 million value in both the "base case" and "best case" scenarios. He fails to justify using the lower value in the "best case" scenario. Petitioners have assembled a workforce of approximately 1,000. A very substantial proportion of them are highly trained professionals, including registered nurses and other trained medical personnel. The Sta-Home tax-exempt entities employed 25 percent of the full-time and 17 percent of the part-time home health care staff in the State of Mississippi. If Hahn has developed an approximate value of $3.4 million, we see no reason not to employ this estimate in the "best case" scenario. Indeed, we suspect that the value of the workforce is higher, but on this record, we cannot reasonably estimate how much.

With respect to another intangible asset, Hahn's "best case" scenario ascribed a value of $667,000 to the "cost gap" attribute that the Sta-Home tax-exempt entities presented for a qualifying buyer. His valuation is based on the assumption that the value of this attribute would end after 1 year. This value is too low. The cost gaps were available under the then-current reimbursement program. They would cease to exist under a PPS. Although there

had been discussions of a PPS for several years, Congress had passed no such legislation at the time of the transfer, and there is no evidence that the prospect of such legislation had a negative effect upon the value of home health care agencies. In fact, one of Hahn's articles, published in the Spring of 1998, demonstrates a "furious pace of home health transfers" from 1994 through 1997. The article contains a chart showing that the number of home health agency transfers did not begin to decrease until the second quarter of 1997. A "best case" scenario would, we think, indicate at least a 2-year value for the cost gap asset. By using a 2-year figure in Hahn's computations, we arrive at a value of more than $1 million for the cost-shifting attribute.

Hahn's valuation of the intangible assets also fails to address the value of the CONs held by the Sta-Home tax-exempt entities. These certificates effectively closed the home health care market to competition during a period of high growth for the industry. Michael Caracci acknowledged his efforts to lobby the Mississippi legislature in the interests of keeping the CON moratorium in place, thus preserving the monopoly of the Sta-Home tax-exempt entities and others who had received CONs before the moratorium. His efforts indicate that the CONs possessed by the Sta-Home tax-exempt entities would be worth considerable amounts to a willing buyer, but Hahn did not ascribe any value to them.

We conclude that the absence of a candid valuation for the Sta-Home tax-exempt entities' intangible assets explains the considerable gap between the adjusted balance sheet value ascertained by Hahn and the $18,675,000 value we have decided today.[8]

We also reject Hahn's assertion that his alternate "market" approach to valuation guideline supports his adjusted balance sheet approach. Initially, we find that his selection of guideline companies is at least adequate. Most of them value "traditional" visiting nurse companies, such as petitioners, and thus Hahn avoids the problem of including home health care agencies that offer more technical home health care services. He has also included both publicly traded and privately held companies in his survey, and he has included both companies that have positive income and companies that reported losses. His guideline companies also include those with a positive net worth and companies that indicate a negative equity capital.

---

[8] Hahn's "best case" scenario indicates that the value of the intangible assets represents 17.68 percent of the total assets. In one of his recent articles, he presents a chart showing the goodwill value of seven publicly traded home health care companies. The lowest of these indicates a goodwill value to total asset ratio of 22 percent, and the others indicate values at 31 percent, 39 percent, 47 percent, 52 percent, and two others at 56 percent. Hahn et al., "Home health Agency Valuation: Opportunity Amid Chaos", Intrinsic Value (Spring 1998).

We are unable, however, to accept Hahn's conclusions of fair market value on the basis of his market approach. Hahn has derived two "Implied Valuation Multiples". The first is a ranking based upon the ratio of selected comparable companies' sale prices to their most current revenues. The second is a ranking of the companies' sale prices to their total book assets.[9] The median sale prices were .68 times annual revenues and 1.9 times total book assets. Here, however, in his "best case" scenario, he has ascertained that the Sta-Home tax-exempt entities would sell at a price only .22 times annual revenues and, further, that they would sell at a price only 1.1 times their total book assets. Hahn's "best case" scenario ranks the Sta-Home tax-exempt entities next to last in both categories. In contrast, none of the comparable companies ranks as low in both categories. Clausen Health Services, for example, sold at a multiple of .22 times revenues, a ratio close to that ascribed to the Sta-Home tax-exempt entities. Clausen's sale price, however, also represented a price-to-asset ratio of 1.64, ranking seventh among the comparables. If the Sta-Home tax-exempt entities sold at this multiple, the indicated fair market value would be

---

[9] It is important to keep in mind that Hahn's valuation multiples generated a figure that represented the total asset value of a company, while Wilhoite's multiples generated the value of its invested capital, or MVIC. Thus, application of the same valuation multiple, say .25, will generally yield different fair market values, depending upon which method is used.

$17,670,040.[10]  Another example shows that House Call, Inc., sold at a price 1.08 times its total assets, a ratio close to the 1.10 that Hahn has ascribed to the Sta-Home tax-exempt entities. House Call, Inc.'s sale price, however, also indicates that it sold at a multiple of .74 times revenues, ranking second of the 13 comparables.  If the Sta-Home tax-exempt entities were sold at this ratio, the indicated sales price would be approximately $33 million.  Moreover, in an article published in the spring of 1997, Hahn indicated that for the prior 2 years, a standard market benchmark for valuing traditional visiting nursing agencies, such as the Sta-Home tax-exempt entities, was a price-to-revenue multiple of .55.  Hahn & Spieler, "Valuation of Home Health Care Companies," Intrinsic Value (Spring 1997).  We fail to understand why the Sta-Home tax-exempt entities had a much lower multiple of .26.  We recognize that the Sta-Home tax-exempt entities operated at a loss for the prior year, but so did 8 of the 13 comparable companies.  We further recognize that the Sta-Home tax-exempt entities' equity capital was a negative amount, but so was that of 7 of the 13 comparable companies. These characteristics reflect the accepted conclusion that exempt entities operating under the Medicare reimbursement system stood

---

[10] The book value used for the Sta-Home tax-exempt entities' total asset value excludes any value for intangible assets.  It is unclear whether Clausen's book value for total assets includes intangibles.

little chance of turning a profit. In fact, Hahn's 1997 article states that "Analysis of recent VNA [i.e. traditional visiting nursing agency] transactions indicates that companies with operating losses have transacted at multiples of revenue similar to agencies with operating profits." Id. at 3.

Accordingly, we conclude that the sale price we have decided more accurately reflects the fair market value of the Sta-Home tax-exempt entities than does that of Hahn. We note that our valuation of $18,675,000 indicates that the Sta-Home tax-exempt entities would sell at a price-to-revenue multiple of .42, lower than the .68 median applicable to Hahn's comparable home health care agencies. Our finding also indicates that the ratio of price to book value would be 1.75, which again is less than the 1.90 median for the same comparable companies.

In reaching this value, we have also considered, but rejected, petitioners' arguments that conditions in Mississippi require a finding that the assets of the Sta-Home tax-exempt entities were worth less than the liabilities assumed. Petitioners argue strenuously that the Sta-Home tax-exempt entities' operation in Mississippi, a relatively poor and rural State, dramatically reduces their fair market value. Petitioners do not mention, however, that the Federal per-patient Medicare payment was higher for Mississippi than for any other State. We

think that this factor substantially offsets the demographic challenges of operating home health care agencies in Mississippi.

Petitioners also maintain that there was no market in Mississippi for acquisition of the Sta-Home tax-exempt entities. The record in this case, however, indicates that there were many such sales, including the purchase of Mississippi home health care agencies by out-of-State hospitals.  We are not convinced that reasonable exploration by a willing seller would have failed to turn up a willing buyer, whether in Mississippi or elsewhere.

F.  Excess Value

Having found the fair market value of the Sta-Home tax-exempt entities, we turn to decide the value in excess of the assumed liabilities.  We are satisfied that the Sta-Home for-profit entities intended to, and did, assume all of the liabilities of the predecessor businesses.  The evidence includes an audited balance sheet, prepared for purposes of this case, which indicates that the total liabilities as of September 30, 1995, were $13,310,860.  To this amount we think there is properly added $201,000, as ascertained by Hahn, representing a reserve account for cost claims disallowed by Medicare.  Total liabilities assumed were therefore $13,511,000.  Subtracting the total liabilities from the fair market value we have decided, results in an excess of $5,164,000:

| | |
|---|---|
| Fair market value | $18,675,000 |
| Assumed liabilities | (13,511,000) |

Excess                                          5,164,000

III.  <u>Excise Taxes Under Section 4958</u>

Section 4958, the provisions of which are set forth in the appendix to this report, was added to the Internal Revenue Code by the Taxpayer Bill of Rights 2, Pub. L. 104-168, sec. 1311(a), 110 Stat. 1452, 1475 (1996).[11]  Section 4958 is patterned after section 4941, which applies to acts of self-dealing between private foundations and disqualified persons.  Section 4958 applies to public charities and social welfare organizations which are exempt from Federal income taxes.[12]

Section 4958 was enacted to impose penalty excise taxes as "intermediate" sanctions in cases where organizations exempt from tax under section 503(c) engage in "excess benefit transactions." H. Rept. 104-506, at 56 (1996), 1996-3 C.B. 49, 104.  An excess

---

[11] No regulations apply to the transactions at issue.  The Treasury Department published proposed regulations under sec. 4958 on Aug. 4, 1998, secs. 53.4958-1 through 53.4958-7, Proposed Excise Tax Regs., 63 Fed. Reg. 41486 (Aug. 4, 1998), which were revised and replaced by temporary regulations effective Jan. 10, 2001, secs. 53.4958-1T through 53.4958-8T, Temporary Excise Tax Regs., 66 Fed. Reg. 2144 (Jan. 10, 2001).  On Jan. 23, 2002, the Treasury Department removed the temporary regulations and published final regulations effective Jan. 23, 2002.  Secs. 53.4958-0 through 53.4958-8, Excise Tax Regs., T.D. 8978, 2002-7 I.R.B. 500.

[12] Sec. 4958 is generally effective for transactions occurring after Sept. 13, 1995.  At trial, the parties directed considerable attention to the effective date of the transfers at issue.  On brief, however, petitioners did not argue that the transfers were effective on or before Sept. 13, 1995, and we deem that argument to have been abandoned.

benefit transaction is one in which a tax-exempt organization provides an economic benefit to one or more of the organization's insiders, called "disqualified persons", if the fair market value of the benefit exceeds the value of what the organization receives in return.  Sec. 4958(c)(1)(A); H. Rept. 104-506, supra at 56, 1996-3 C.B. at 104.  Disqualified persons include not only those who are able to exercise substantial influence over the tax-exempt organization, but also their family members and entities in which those individuals have 35 percent of the voting power.  Disqualified persons are subject to the excise penalties, whether the excess benefit transactions are accomplished "directly or indirectly".  Sec. 4958(c).

Before the enactment of section 4958, if an organization within its purview did not comply with the rules regarding tax exemption, the Commissioner's only recourse was to revoke the organization's exemption.  The Treasury Department realized that such a response might be inappropriate when the exempt organization did not conform to all the applicable rules but was nevertheless capable of functioning for a charitable purpose. See U.S. Department of the Treasury's Proposals to Improve Compliance by Tax-Exempt Organizations: Hearing Before the Subcommittee on Oversight of the House Comm. On Ways and Means, 103d Cong., 2d Sess. 17 (1994).  At the urging of the Treasury

Department, Congress enacted section 4958.  See H. Rept. 104-506,
supra at 56, 1996-3 C.B. at 104.

A disqualified person who receives an excess benefit from an
excess benefit transaction is liable for an initial excise tax
equal to 25 percent of the excess benefit.  Sec. 4958(a)(1).  If
the initial tax is imposed and the transaction is not corrected
within the taxable period, then the disqualified person is liable
for an additional tax of 200 percent of the excess benefit.  Sec.
4958(b).

Here, the fair market value of the Sta-Home tax-exempt
entities' transferred assets far exceeded the consideration paid
by the Sta-Home for-profit entities.  Thus, the asset transfers
were excess benefit transactions which directly benefited the
transferees (i.e., the Sta-Home for-profit entities) and
indirectly benefited the Sta-Home for-profit entities'
shareholders (i.e., the Caracci family members).  Petitioners do
not seriously dispute that they are disqualified persons with
respect to the Sta-Home tax-exempt entities.  Joyce P. Caracci,
Michael Caracci, and Christina C. McQuillen, as directors and
officers of each of the three Sta-Home tax-exempt entities, are
disqualified persons because they were in positions to exercise
substantial influence over the entities' affairs.  Sec.
4958(f)(1)(A).  Victor Caracci and Vincent Caracci are
disqualified persons because of their familial relationships to

Joyce P. Caracci, Michael Caracci, and Christina C. McQuillen. Sec. 4958(f)(1)(B). Sta-Home Health Agency of Carthage, Inc., Sta-Home Health Agency of Greenwood, Inc., and Sta-Home Health Agency of Jackson, Inc., are disqualified persons because they are entities that are 35-percent controlled by disqualified persons; in fact, members of the Caracci family own 100 percent of the Sta-Home for-profit entities' voting stock. Sec. 4958(f)(1)(C). Accordingly, petitioners are subject to excess benefit taxes under section 4958.

Because we have decided the value of the Sta-Home tax-exempt entities' assets on the basis of a revenue multiple, it is appropriate to ascribe the excess benefit to each of the Sta-Home for-profit entities in proportion to the amounts the 1995 revenues of their respective predecessors bore to the total revenue. This produces the following results:

| Entity | Percentage | Benefit |
| --- | --- | --- |
| Sta-Home Health Agency of Carthage, Inc. | 42.1 | $2,173,682 |
| Sta-Home Health Agency of Greenwood, Inc. | 30.1 | 1,554,105 |
| Sta-Home Health Agency of Jackson, Inc. | 27.8 | 1,435,353 |

Because each of the three entities acquired or assumed its predecessor's assets and liabilities, as opposed to acquiring its predecessor's stock, we see no basis to apply a minority discount to the value of the excess benefits each has received. Nor for that reason is an application of a minority discount appropriate

as to the excise taxes imposed upon the individual shareholders of the Sta-Home for-profit entities.

We conclude that each of the disqualified person/petitioners is jointly and severally liable for the initial and additional taxes under section 4958(a)(1) and (b) as to the excess benefits. The effect of our holding is that the individual petitioners are jointly and severally liable for the total excess benefit of $5,164,000 from the three Sta-Home entities, while the Sta-Home for profit entities are liable for taxes as specified in the above table. In so concluding, we decline at this time petitioners' invitation to abate the initial and additional excise taxes pursuant to section 4961 (second-tier tax abatement) and section 4962(a) (first-tier tax abatement). Because the excess benefit transactions have never been corrected for purposes of section 4958(f)(6), petitioners' invitation is, at best, premature. Petitioners have not as of yet met the prerequisite for the requested abatement; i.e., a timely correction. In this regard, however, we note that sections 4961(a) and 4963(e)(1) generally allow for the abatement of a section 4958 excise tax if the excess benefit transaction giving rise thereto is corrected within 90 days after our decision sustaining the tax becomes final. Cf. Morrissey v. Commissioner, T.C. Memo. 1998-443. Because the issue of whether petitioners

will or would qualify for an abatement is not yet ripe for decision, we express no opinion on this issue.

IV.   Revocation of Tax-Exempt Status

Section 501(c)(3) requires, among other things, that an organization be operated exclusively for one or more specified exempt purposes.  An organization is not operated exclusively for one or more exempt purposes unless it serves a public rather than a private interest and its net earnings do not inure to the benefit of any shareholder or individual.  Sec. 1.501(c)(3)-1, Income Tax Regs.

The presence of a single substantial nonexempt purpose can destroy the exemption regardless of the number or importance of exempt purposes.  Better Bus. Bureau v. United States, 326 U.S. 279, 283 (1945); Am. Campaign Acad. v. Commissioner, 92 T.C. 1053, 1065 (1989).  When an organization operates for the benefit of private interests, such as designated individuals, the creator or his family, or persons directly or indirectly controlled by such private interests, the organization by definition does not operate exclusively for exempt purposes.  Prohibited benefits may include an advantage, profit, fruit, privilege, gain, or interest.  Am. Campaign Acad. v. Commissioner, supra at 1065-1066.  We have held that when a section 501(c)(3) tax-exempt entity sells its assets for less than fair market value to a for-profit corporation whose shareholders are directors of the tax-

exempt entity, the sale constitutes inurement and revocation may be appropriate. Anclote Psychiatric Ctr., Inc. v. Commissioner, T.C. Memo. 1998-273.

With the enactment of section 4958, however, the issue whether the tax-exempt status of the Sta-Home tax-exempt entities should be revoked must now be considered in the context of the "intermediate sanction" provisions. As noted above, the intermediate sanction regime was enacted in order to provide a less drastic deterrent to the misuse of a charity than revocation of that charity's exempt status. The legislative history explains that "the intermediate sanctions for 'excess benefit transactions' may be imposed by the IRS in lieu of (or in addition to) revocation of an organization's tax-exempt status." H. Rept. 104-506, supra at 59, 1996-3 C.B. at 107. A footnote to this statement explains: "In general, the intermediate sanctions are the sole sanction imposed in those cases in which the excess benefit does not rise to a level where it calls into question whether, on the whole, the organization functions as a charitable or other tax-exempt organization". Id. n.15, 1996-3 C.B. at 107. Although the imposition of section 4958 excise taxes as a result of an excess benefit transaction does not preclude revocation of the organization's tax-exempt status, the legislative history indicates that both a revocation and the imposition of intermediate sanctions will be an unusual case.

We do not believe that this is such an unusual case. The dormant state of the Sta-Home tax-exempt entities precludes calling into question whether, on the whole, they are functioning tax-exempt entities. Moreover, we perceive three reasons why it is not appropriate to remove their tax-exempt status at this time. First, the excess benefit represented the fair market value of the Sta-Home tax-exempt entities' assets less the liabilities assumed by the Sta-Home for-profit entities. Given that we have already sustained the imposition of intermediate sanctions as to this excess value, we do not believe it appropriate under the facts herein to conclude that the single transaction (as to each entity) underlying the excess value also requires our revocation of each entity's tax-exempt status. Second, the Sta-Home tax-exempt entities have not since the transfers been operated contrary to their tax-exempt purpose. Third, we find some credence in petitioners' suggestion that maintenance of the tax exemption may enable them to utilize the correction provisions made available in sections 4961 through 4963. While the issue is not ripe for us to decide at this time, we note that a permissible correction may require that the Sta-Home for-profit entities transfer the assets back to the Sta-Home tax-exempt entities. If we were to remove the Sta-Home tax-exempt entities' tax-exempt status at this stage, however,

those entities would no longer be tax-exempt entities available to receive the assets.

The legislative history quoted above indicates that "the term 'correction' means undoing the excess benefit to the extent possible and taking any additional measures necessary to place the organization in a financial position not worse than that in which it would be if the disqualified person were dealing under the highest fiduciary standards." H. Rept. 104-506, supra at 59, 1996-3 C.B. at 107. Petitioners suggest that preserving the tax-exempt status of the now-dormant tax-exempt Sta-Home entities may leave petitioners with a means of correction by placing the entities back into a "financial position not worse than it would be" if the disqualified persons had observed the proper standards. While, as noted above, we do not address the issue of timely corrections, we believe that leaving the exemptions intact is consistent with both the legislative history underlying section 4958 and the provisions for abatement in sections 4961 through 4963.

V. Income Taxes

Michael Caracci, Vincent Caracci, and Christina McQuillen (collectively, the Caracci children) had no ownership interest in the Sta-Home tax-exempt entities. The Caracci children also did not contribute any property to the Sta-Home for-profit entities in exchange for the stock that they received in those entities

upon their formation. Respondent determined that the Caracci children realized gross income by virtue of the fact that the Sta-Home for-profit entities, in connection with their organization, received the assets of the Sta-Home tax-exempt entities. Respondent argues in brief that the assets of the Sta-Home tax-exempt entities were constructively transferred to the Caracci children who, in turn, contributed those assets to the Sta-Home for-profit entities. Respondent argues in brief that the constructive transfer is an accession to wealth that is includable in the Caracci children's gross income under section 61.

We disagree with respondent that the asset transfer resulted in gross income to the Caracci children. Although section 61 provides broadly that gross income includes all income "from whatever source derived", section 102(a) generally exempts from that provision the value of any property received by gift. When property is transferred for less than adequate and full consideration in money or money's worth, the amount by which the value of the property exceeds the value of the consideration is deemed a gift. Sec. 2512(b); Commissioner v. Wemyss, 324 U.S. 303 (1945); Georgia Ketterman Trust v. Commissioner, 86 T.C. 91, 96 (1986); Estate of Higgins v. Commissioner, T.C. Memo. 1991-47. In the corporate setting, such a transfer may be a gift by the donor to the individual shareholders of the corporation to the

extent of their proportionate interests in the corporation. Kincaid v. United States, 682 F.2d 1220, 1224 (5th Cir. 1982); Chanin v. United States, 183 Ct. Cl. 840, 393 F.2d 972 (1968); Estate of Hitchon v. Commissioner, 45 T.C. 96, 103-104 (1965); Tilton v. Commissioner, 88 T.C. 590, 597 (1987); Estate of Trenchard v. Commissioner, T.C. Memo. 1995-121; sec. 25.2511-1(h)(1), Gift Tax Regs. When the shareholders of a recipient corporation are members of the donor's family, that fact is strongly indicative of a gift. See Kincaid v. United States, supra; Tilton v. Commissioner, supra; Estate of Hitchon v. Commissioner, supra; Estate of Trenchard v. Commissioner, supra; Estate of Higgins v. Commissioner, supra.

Here, Victor and Joyce Caracci set up transactions pursuant to which their three children each received stock in the Sta-Home for-profit entities that, in connection therewith, had a total net asset value of more than $5 million. The Caracci children, the natural heirs of Victor and Joyce Caracci, paid nothing for that stock, nor did they contribute property for it. The transfers were effectively gifts to the Caracci children.

The fact that the children were also employees of the new corporations does not transform their receipt of 65 percent of the corporate stock into compensation subject to income tax. We are aware that section 102(c) provides that the transfer of property to an employee is generally deemed to be compensation,

rather than a gift.  We believe, however, that a transfer of property to an employee who is a member of the employer's family is more properly considered a gift when the transfer is not made in recognition of the employee's work but is made in connection with the family relationship.

The transfer of most of the assets involved in this case is clearly attributable to the familial relationship between the Caracci parents and their children.  It contrasts strongly to situations cited by respondent involving compensation, such as Strandquist v. Commissioner, T.C. Memo. 1970-84 (president of car sales company taxable on value of new cars he received in excess of value of used cars he turned in).  Nor is this a situation involving disguised rentals paid to a lessor-shareholder, as in Haag v. Commissioner, 334 F. 2d 351, 355 (8th Cir. 1964), affg. 40 T.C. 488 (1963).  Nor is it, in substance, a distribution with respect to the stock of a controlling shareholder for his personal benefit, as in Kenner v. Commissioner, T.C. Memo. 1974-273 (doctor who owned tax-exempt hospital corporation taxed on relatively small amounts it transferred to corporation that operated his ranch in Arizona).  Here, during the year in issue, none of the home health care assets was distributed to any of the children, and none of the children sold the stock or otherwise benefited personally from the transfer of the home health care assets to the for-profit entities.

On the evidence before us, we conclude that the transfers of the home health care assets to the for-profit entities constituted gifts to the Caracci children, and not the realization of taxable income by them.  They are not subject to income taxes on those transfers.

In view of the foregoing,

Decisions will be entered for petitioners in docket Nos. 14711-99X, 17336-99X, and 17339-99X, and will be entered under Rule 155 in the remaining dockets.

APPENDIX

SEC. 4958. TAXES ON EXCESS BENEFIT TRANSACTIONS

(a) Initial Taxes.--

(1) On the disqualified person.--There is hereby imposed on each excess benefit transaction a tax equal to 25 percent of the excess benefit. The tax imposed by this paragraph shall be paid by any disqualified person referred to in subsection (f)(1) with respect to such transaction.

(2) On the management.--In any case in which a tax is imposed by paragraph (1), there is hereby imposed on the participation of any organization manager in the excess benefit transaction, knowing that it is such a transaction, a tax equal to 10 percent of the excess benefit, unless such participation is not willful and is due to reasonable cause. The tax imposed by this paragraph shall be paid by any organization manager who participated in the excess benefit transaction.

(b) Additional Tax on the Disqualified Person.--In any case in which an initial tax is imposed by subsection (a)(1) on an excess benefit transaction and the excess benefit involved in such transaction is not corrected within the taxable period, there is hereby imposed a tax equal to 200 percent of the excess benefit involved. The tax imposed by this subsection shall be paid by any disqualified person referred to in subsection (f)(1) with respect to such transaction.

(c) Excess Benefit Transaction; Excess Benefit.--For purposes of this section--

(1) Excess benefit transaction.--

(A) In general.--The term "excess benefit transaction" means any transaction in which an economic benefit is provided by an applicable tax-exempt organization directly or indirectly to or for

the use of any disqualified person if the value of the economic benefit provided exceeds the value of the consideration (including the performance of services) received for providing such benefit.  For purposes of the preceding sentence, an economic benefit shall not be treated as consideration for the performance of services unless such organization clearly indicated its intent to so treat such benefit.

(B) Excess benefit.--The term "excess benefit" means the excess referred to in subparagraph (A).

(2) Authority to include certain other private inurement.--To the extent provided in regulations prescribed by the Secretary, the term "excess benefit transaction" includes any transaction in which the amount of any economic benefit provided to or for the use of a disqualified person is determined in whole or in part by the revenues of 1 or more activities of the organization but only if such transaction results in inurement not permitted under paragraph (3) or (4) of section 501(c), as the case may be.  In the case of any such transaction, the excess benefit shall be the amount of the inurement not so permitted.

(d) Special Rules.--For purposes of this section--

(1) Joint and several liability.--If more than 1 person is liable for any tax imposed by subsection (a) or subsection (b), all such persons shall be jointly and severally liable for such tax.

(2) Limit for management.--With respect to any 1 excess benefit transaction, the maximum amount of the tax imposed by subsection (a)(2) shall not exceed $10,000.

(e) Applicable Tax-Exempt Organization.--For purposes of this subchapter, the term "applicable tax-exempt organization" means--

(1) any organization which (without regard to any excess benefit) would be described in paragraph (3) or (4) of section 501(c) and exempt from tax under section 501(a), and

(2) any organization which was described in paragraph (1) at any time during the 5-year period ending on the date of the transaction.

Such term shall not include a private foundation (as defined in section 509(a)).

(f) Other Definitions.--For purposes of this section--

(1) Disqualified person.--The term "disqualified person" means, with respect to any transaction--

(A) any person who was, at any time during the 5-year period ending on the date of such transaction, in a position to exercise substantial influence over the affairs of the organization,

(B) a member of the family of an individual described in subparagraph (A), and

(C) a 35-percent controlled entity.

(2) Organization manager.--The term "organization manager" means, with respect to any applicable tax-exempt organization, any officer, director, or trustee of such organization (or any individual having powers or responsibilities similar to those of officers, directors, or trustees of the organization).

(3) 35-percent controlled entity.--

    (A) In general.--The term "35-percent controlled entity" means--

        (i) a corporation in which persons described in subparagraph (A) or (B) of paragraph (1) own more than 35 percent of the total combined voting power,

        (ii) a partnership in which such persons own more than 35 percent of the profits interest, and

        (iii) a trust or estate in which such persons own more than 35 percent of the beneficial interest.

    (B) Constructive ownership rules.--Rules similar to the rules of paragraphs (3) and (4) of section 4946(a) shall apply for purposes of this paragraph.

(4) Family members.--The members of an individual's family shall be determined under section 4946(d); except that such members also shall include the brothers and sisters (whether by the whole or half blood) of the individual and their spouses.

(5) Taxable period.--The term "taxable period" means, with respect to any excess benefit transaction, the period beginning with the date on which the transaction occurs and ending on the earliest of--

    (A) the date of mailing a notice of deficiency under section 6212 with respect to the tax imposed by subsection (a)(1), or

(B) the date on which the tax imposed by subsection (a)(1) is assessed.

(6) Correction.--The terms "correction" and "correct" mean, with respect to any excess benefit transaction, undoing the excess benefit to the extent possible, and taking any additional measures necessary to place the organization in a financial position not worse than that in which it would be if the disqualified person were dealing under the highest fiduciary standards.