United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 11, 2006**

Charles R. Fulbruge III
Clerk

REVISED JULY 31, 2006

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 02-60912

MICHAEL T. CARACCI, ET AL.,

                                Petitioners - Appellants,

                    versus

COMMISSIONER OF INTERNAL REVENUE,

                                Respondent - Appellee.

_____

STA-HOME HEALTH AGENCY OF CARTHAGE, INC.; STA-HOME
HEALTH AGENCY OF GREENWOOD, INC.; MICHAEL CARACCI;
VICTOR CARACCI; CHRISTINA C. MCQUILLEN; JOYCE P. CARACCI;
VINCENT E. CARACCI; STA-HOME HEALTH AGENCY OF JACKSON, INC.,

                                Petitioners - Appellants,

                    versus

COMMISSIONER OF INTERNAL REVENUE,

                                Respondent - Appellee.

Appeal from the Decision of
the United States Tax Court

Before JOLLY and WIENER, Circuit Judges, and ROSENTHAL,

District Judge.[*]

PER CURIAM:

The Commissioner of Internal Revenue issued deficiency notices requiring the taxpayers, three privately held home-healthcare agencies and the family that owns and operates them, to pay over $250 million in excise taxes under 26 U.S.C. § 4958. The Commissioner based the deficiency notices on an internal valuation of assets and liabilities transferred when the agencies converted from exempt to nonexempt status, finding that the taxpayers received a "net excess benefit" in the amount of $18.5 million. The taxpayers challenged the deficiency notices in the Tax Court. During a two-year audit and nearly two years of litigation, the Commissioner insisted that the deficiency notices and underlying valuations were correct. At the trial before the Tax Court, the Commissioner for the first time conceded that the deficiency notices were both excessive and erroneous. The Tax Court recognized that the Commissioner's deficiency notices were wrong. The Tax Court also found that the valuation expert the Commissioner presented at trial—the only support the Commissioner presented

[*] District Judge for the Southern District of Texas, sitting by designation.

for imposing excise taxes—also committed significant errors in his analysis. The Tax Court nonetheless affirmed the Commissioner's decision to impose excise taxes, finding that the fair market value of the assets transferred from the exempt entities to the newly created nonexempt entities exceeded the value of the liabilities and debts assumed as consideration by over $5 million.

In this appeal, the Commissioner does not dispute that the deficiency notices were erroneous. The Commissioner also concedes that the Tax Court made a $1.78 million mistake in its valuation analysis. The Commissioner nonetheless insists that the Tax Court correctly found that the taxpayers received a "net excess benefit" of over $5 million in the conversion from exempt to nonexempt status and collectively owed $69,702,390 in excise taxes under I.R.C. § 4958(a) and (b).[1]

The taxpayers contend that the Tax Court made numerous factual and legal errors in valuing the assets transferred in the conversion from exempt to nonexempt status. We agree. As explained below, the Tax Court erred as a matter of law in affirming the Commissioner's decision to impose excise taxes

---

[1] The Tax Court entered separate orders as to each taxpayer; these cases were consolidated in the Tax Court and remain so in this court.

after the Commissioner failed to meet his burden of proving that the taxes were correctly assessed; erred as a matter of law in selecting the method to value the assets and liabilities transferred; and made clearly erroneous fact findings in applying that valuation method. We reverse and render because the record establishes as a matter of law that the taxpayers did not receive any "net excess benefit" and therefore are not liable for the excise taxes assessed.

## I.  Background

In 1976, Joyce Caracci, an experienced nurse, her husband, Victor Caracci, and a third person started the Sta-Home Health Agency, Inc. to provide home health care in a geographically large and primarily rural part of Mississippi. A year later, Joyce and Victor Caracci and the third individual formed two other Sta-Home agencies, Sta-Home Health Agency, Inc., of Forest, Mississippi and Sta-Home Health Agency, Inc., of Grenada, Mississippi. The shareholders, directors, and officers of the Sta-Home entities were Caracci family members who also worked for the agencies.

The three Sta-Home entities were nonstock, tax-exempt corporations formed under Mississippi law. To comply with the Medicare regulations in place when the Caraccis began their

4

business, the agencies had to be tax-exempt under the Internal Revenue Code § 501(c)(3) (26 U.S.C. § 501(c)(3)). In the 1980s, the law changed to permit agencies such as Sta-Home to be formed as nonexempt corporations.

The Sta-Home agencies served the rural poor in a large area in northeast Mississippi. The agencies were intended to provide home healthcare as an alternative to what Joyce Caracci believed from her long professional experience was unacceptable institutional care available from nursing homes and other facilities in the region. A large majority of the patients Sta-Home served depended on Medicare and Medicaid. It is undisputed that between 95 and 97 percent of Sta-Home's income consisted of Medicare and Medicaid reimbursements.

In 1995, Medicare reimbursed home-healthcare providers the lesser of the actual reasonable cost or the customary charge, up to a maximum per-visit "cost cap." Medicare paid retrospectively, sending a "periodic interim payment"—known as a PIP—every two weeks. Home-healthcare agencies also submitted quarterly and annual cost reports, which Medicare used to adjust disparities between interim payments made and actual costs reported by reimbursing the provider for any underpayment or requiring the provider to remit any overpayment. Under the

5

Medicare reimbursement system, home-healthcare agencies like Sta-Home effectively had no ability to realize profits. Medicare did not even reimburse all of the costs expended, but only costs it deemed "allowable."  If Sta-Home submitted a claim for reimbursement that Medicare denied, the result for Sta-Home was a negative cash outflow.  On average, Medicare disallowed .7 percent of Sta-Home's submitted annual costs. As a result, the greater the volume of Sta-Home's business—the more care Sta-Home provided patients and the more revenue it received—the more money it lost.

Sta-Home generated increased revenue and commensurately increased losses from 1992 through 1995.  Financial statements revealed that the Sta-Home corporations' expenses exceeded its revenues every year.  Not only did Sta-Home sustain repeated net operating losses, its capital deficit increased every year from 1991 through 1995.  At the end of fiscal year 1995, the combined assets and stated liabilities of the three Sta-Home exempt agencies was a negative $1.4 million.[2]

To ease this precarious financial situation, Sta-Home required its newly hired employees to forgo pay for the first

---

[2]  The net income for each respective year from 1991 to 1995 was: -$63,660; $27,757; -$45,554; -$258,729; and -$433,390.  The total deficit Sta-Home ran for the same period was: $583,526; $555,771; $729,145; $901,535; and $1,408,248.

month of employment. Sta-Home paid this amount only when employees left the company. Sta-Home also underpaid salaries and wages during the year, using year-end "bonuses" to make up unpaid compensation amounts. Sta-Home also deferred or accrued contributions to employee benefit plans. These efforts to ease cash-flow difficulties affected all Sta-Home's employees, including the Caracci family members.

During this period, Mississippi was the highest-ranking state in the country in payments per Medicare recipient. As noted, during 1995, over 95 percent of the services Sta-Home provided went to Medicare beneficiaries. State law required home-healthcare agencies in Mississippi to operate under a Certificate of Need (CON). In 1983, Mississippi imposed a moratorium on the issuance of new CONs, which prevented new competitors from entering the industry unless they purchased an existing CON. The combined Sta-Home entities had CONs in nineteen Mississippi counties. The Sta-Home corporations ranked first or second in market share in 14 of the 19 rural Mississippi counties they served. "Sta-Home" was a recognized name in home healthcare in Mississippi and enjoyed a strong reputation among the state's elderly. In 1993, Sta-Home was the first freestanding agency to be accredited by the Joint

7

Commission on Accreditation of Healthcare Organizations, which required achieving or exceeding certain regulatory standards, including standards regulating the quality of patient care.

During 1994 and 1995, a change in the Medicare regulations was proposed, under which certain healthcare entities accepting Medicare payments would change from the retrospective PIP system to a prospective payment system to be known as "PPS." Under PPS, healthcare providers would file a claim for each service rendered and then wait for it to be processed and paid.[3] Concerned about the impact of this system on Sta-Home's already fragile cash flow, the Caraccis consulted an attorney, Thomas Kirkland. He recommended converting Sta-Home into for-profit corporations, which Medicare regulations had permitted since the 1980s. The conversion to nonexempt status would allow Sta-Home to borrow money that lenders were unwilling to provide to exempt entities. Kirkland's law firm had represented many home-healthcare agencies in Mississippi, and Kirkland was a recognized expert in the legal issues relating to such agencies. He advised all his tax-exempt healthcare-agency clients to convert to nonexempt status. Most of

---

[3] Congress ultimately passed the system in 1997. Medicare fully implemented the PPS system in 2001.

Kirkland's clients followed his advice. The primary form of conversion used was a transfer of assets from the old exempt corporations to the newly formed nonexempt subchapter-S corporations, in exchange for assuming the debts and liabilities of the exempt corporations.

Sta-Home took a careful and conscientious approach to the conversion. Not only did Sta-Home consult with an attorney knowledgeable in the area, it also retained a tax attorney whose accounting firm obtained two contemporaneous appraisals of Sta-Home's assets and liabilities. These appraisals showed that Sta-Home's liabilities exceeded the value of its tangible and intangible assets. The appraisals specifically showed that the value of the intangible assets—including the CONs—would not result in a positive fair market value because the assets had been consistently unprofitable. These appraisals were consistent with the Caraccis' conclusion that unless they did something to provide more cash and capital, they would likely not be able to continue to operate.

Before Sta-Home changed from tax-exempt to nonexempt status, it investigated other alternatives to meet its need for improved cash flow and access to capital in light of the anticipated change from a PIP to a PPS Medicare reimbursement

9

system.  Sta-Home looked for a hospital in its service area that could purchase the agencies, to provide capital and additional patient referrals.  The search proved fruitless.  Sta-Home discovered that the potential purchasers were uninterested; the most likely candidate had acquired a home-healthcare agency the prior year.  With no prospective or potential buyer, Sta-Home decided to convert to nonexempt status.

On July 11, 1995, Sta-Home's board of directors authorized the conversion of the tax-exempt entities into nonexempt subchapter-S corporations.  Sta-Home Health Agency, Inc. was converted to Sta-Home Health Agency of Jackson, Inc.; Sta-Home Health Agency, Inc., of Forrest, Mississippi was converted to Sta-Home Health Agency of Carthage, Inc.; and Sta-Home Health Agency, Inc., of Grenada, Mississippi was converted to Sta-Home Health Agency of Greenwood, Inc.  The exempt corporations transferred their tangible and intangible assets to the for-profit corporations in exchange for the assumption of, and indemnification against, liabilities.  The contemporaneous appraisals performed in support of the conversion showed that the consideration for the assets—the agreement to assume the debts and liabilities—exceeded the value of the assets, which

10

had been unprofitable for the previous five years. It is undisputed that after the conversion, the Sta-Home entities continued to operate as before, providing the same services to the same patients in the same manner, subject to the same Medicare limits on profit.

In 1999, after an extended audit period, the Commissioner issued deficiency notices to the Caracci family and the Sta-Home agencies. The Commissioner determined that the value of the assets transferred to the nonexempt Sta-Home corporations exceeded the value of the liabilities and debts assumed by approximately $18.5 million. Based solely on that valuation analysis, the Commissioner concluded that the transfer provided an "excess benefit" to the newly created nonexempt corporations and the Caracci family, in violation of I.R.C. § 4958, which imposes a 25 percent and a 200 percent penalty in the form of excise taxes on "excess benefit transactions." The deficiency notices asserted that the taxpayers owed excise taxes totaling $256,114,435.

The Commissioner based the deficiency notices on a brief internal memorandum. This memorandum stated: "This intermediate determination of value should not be considered final until issuance of the final economic report." The

11

deficiency notices were not based on a final economic report, instead using the figures from the "intermediate determination of value" in stating that the conversion from exempt to nonexempt status resulted in a net excess benefit of $18,543,694 and triggered excise taxes and penalties of over $250 million. Sta-Home and the Caracci family filed timely petitions in the United States Tax Court challenging the determination of their tax liabilities.

In the Tax Court, the taxpayers pointed out that one problem with the deficiency notices was that the valuations made no adjustment for the liabilities that the nonexempt corporations assumed as consideration for acquiring the assets from the exempt corporations. The taxpayers moved for partial summary judgment based on this problem in the deficiency notices. The Commissioner responded that the notices were correct, filing affidavits in opposition to the partial summary judgment motion swearing to the validity of the deficiency amounts and the consequent excise tax amounts. It was not until the trial before the Tax Court that the Commissioner acknowledged that the deficiency notices were wrong. On cross-examination, the Commissioner's own expert witness admitted that the notices were "excessive," "incorrect," and

12

"erroneous."

On May 22, 2002, the Tax Court affirmed the finding that the conversion resulted in a "net excess benefit" triggering excise taxes and penalties, but reduced the amount of the benefit and the resulting amounts that Sta-Home and the Caracci family owed. The Tax Court found that the value of the exempt former Sta-Home entities' debts and liabilities that the newly formed nonexempt Sta-Home entities assumed was $13.5 million. The parties do not challenge this valuation on appeal. The Tax Court found that the newly formed nonexempt Sta-Home entities received assets from the exempt former entities worth $20.8 million, exceeding the value of the assumed liabilities by $5.1 million. In so finding, the Tax Court rejected both the $20 million figure the Commissioner had asserted as the amount of the net excess benefit in its deficiency notices and also rejected the amount that the Commissioner's expert presented.

Both Sta-Home and the Commissioner presented detailed expert testimony on the fair market value of Sta-Home's tangible and intangible assets at the time of the conversion from nonexempt to exempt status. The expert witnesses for both the taxpayers and the Commissioner agreed that traditional valuation methodology uses three approaches: (1) income; (2)

13

cost; and (3) market.  An income approach assigns value based on determining how much money an owner will derive from the business in the future.  A cost approach values a business by determining how much it would cost to replace the entity's tangible and intangible assets.[4]  A market approach tries to establish the market value of a company, usually by comparing sales or transfers of similar companies.  The experts disagreed on how to value Sta-Home's assets and what assumptions should be used.  The Tax Court agreed with neither expert, instead selecting aspects from the Commissioner's expert to piece together its own valuation result.

Sta-Home's expert, Allen D. Hahn, is a director at Pricewatershouse Coopers Northeast Region Corporation Valuation Consulting Group.  He has written extensively on valuing home-healthcare agencies.  The Commissioner unsuccessfully attempted to hire Hahn for this case, recognizing his expertise.  To prepare his analysis of the Sta-Home conversion, Hahn spent

---

[4]  Assets in accounting are items of worth to a company, categorized as tangible (for example, property) and intangible (for example, community goodwill).  A company's assets are equal to its liabilities and ownership equity combined.  Margaret A. Gibson, *The Intractable Debt/Equity Problem: A New Structure for Analyzing Shareholder Advances*, 81 Nw. U. L. Rev. 452, 482 n.216 (1987). Liabilities (debt) and equity are the principal methods of financing a company.  *Id.* at 456–57.  Under debt financing, a corporation borrows funds; while under equity financing, a corporation raises funds by issuing stock.  *Id.*

eight weeks in Mississippi, studying the assets and liabilities transferred in the conversion and analyzing the home-healthcare industry in the area.

The Commissioner, unable to retain Hahn, hired Charles Wilhoite. Although Wilhoite is a certified public accountant and codirector of the Portland, Oregon office of Willamette Management Associates, a business valuation firm, he had no prior experience with the home-healthcare industry. Wilhoite spent only two days in Mississippi to study the Sta-Home entities in order to value their assets and liabilities and spent one of those days in a hotel room tracking down lost luggage. Lacking detailed or thorough knowledge about the home-healthcare industry in general or in the part of Mississippi where Sta-Home operated, and about Sta-Home itself, Wilhoite instead relied on his general valuation knowledge and experience and the information learned in the single day he spent interviewing Sta-Home's chief financial officer. In short, neither the Commissioner nor his expert witness did the work necessary to perform an asset-valuation analysis of the Sta-Home entities throughout the extended audit period or

15

during the Tax Court litigation.[5]

Hahn's analysis carefully took into account the economic realities of home-healthcare agencies that depended almost entirely on Medicare reimbursements rather than on private payers, lost an average of .7 percent annually on their operating costs, did not offer specialized services that could generate profits, and had a capital deficit. Hahn used an "adjusted balance sheet" method to value the Sta-Home assets, adjusting the values identified on the companies' balance sheet to their fair market value equivalent.[6] Hahn prepared both a "base case" and a "best case" scenario, developing a range of fair market values for Sta-Home's assets ranging between $10.5 million and $11.5 million. Hahn specifically valued Sta-Home's intangible assets, attributing between $2.1 million and $3.4 million to the CONs and the workforce. Hahn found that the Sta-Home entities' total liabilities ranged between $12 million and $12.5 million, concluding that these liabilities exceeded

---

[5]  The Commissioner faults Sta-Home for failing to provide access to more information about the corporations, but this argument ignores the discovery tools that the Commissioner had available and ignores the fact that it is the Commissioner's burden to show that the tax it imposed was correct, not the taxpayers' burden to show that the Commissioner was wrong.

[6]  A company's balance sheet documents the historical cost of its assets, liabilities, and ownership equity. Shannon P. Pratt *et al.*, *Valuing Small Businesses and Professional Practices* 366 (3d ed. 1998).

the value of Sta-Home assets by $.5 million to $2 million.

To check this asset valuation, Hahn also used a market approach, comparing the Sta-Home transactions to thirteen private transactions involving home-healthcare agencies engaged in by publicly traded companies. Hahn cautioned that the market approach was only a secondary indication of value because transactions involving other home-healthcare providers were too dissimilar to the Sta-Home transactions used to effect the conversion from exempt to nonexempt entities to serve as the basis for a stand-alone valuation. Hahn noted that although Sta-Home provided only traditional home healthcare, publicly traded companies often used home-healthcare agencies as part of a broader mix of healthcare businesses. Sta-Home's heavy dependence on Medicare reimbursements also made it difficult to compare with publicly traded companies offering services to a mix that included a much larger number of private payers and far fewer Medicare patients than Sta-Home. The Commissioner's expert conceded that home-healthcare agencies serving private-pay patients can make a profit on those services if they are run well; by contrast, healthcare agencies cannot make a profit on serving Medicare patients. Hahn also noted that sales of home-healthcare agencies that provided

17

sophisticated treatments could not be included as comparables because these treatments attracted higher payments and reimbursements than the services provided by Sta-Home.

Based on the adjusted balance sheet method and the corroboration provided by the comparable market approach, Hahn concluded that the liabilities the Sta-Home nonexempt entities agreed to assume from the nonexempt entities exceeded the value of the assets received by $600,000 to $2,350,000, resulting in no net excess benefit and therefore no excise tax liability. Hahn reached this result without applying a minority stock discount, reasoning that the shares represented interests in a loss corporation,[7] and without a discount for lack of marketability,[8] concluding that the unattractive healthcare market in Mississippi was already incorporated into his adjusted balance sheet valuation.

The Commissioner's expert, Wilhoite, lacked the specific information about the Sta-Home entities necessary to value

---

[7] When an individual has less than 50 percent ownership interest in a company, it is deemed a "minority" ownership interest and discounted to reflect the holder's lack of control of the business. Pratt, *Valuing Small Businesses* at 426-30.

[8] "Marketability" is the ability to convert property to cash quickly. When companies are not traded on the public market, they are less marketable and therefore valued less. Pratt, *Valuing Small Businesses* at 446-48.

their assets, particularly the intangible assets. Wilhoite assumed that those intangible assets had significant value to potential purchasers, despite Sta-Home's history of losses, because several home-healthcare agencies acquired in recent transactions incurred losses just before those agencies were purchased for large amounts.[9] Wilhoite used market-based and income-based approaches to assign values to all Sta-Home's assets in general, without valuing any of Sta-Home's assets in particular.

For both the market and income approaches, Wilhoite determined the "market value of invested capital" (MVIC), which represents the market value of ownership equity plus debt invested in a company. The MVIC is commonly used in valuing private companies because it minimizes differences in capital structure between private and public corporations.[10] Wilhoite assumed that this method could be applied to value the Sta-Home entities' assets, despite the fact that method is designed to value a company's invested capital, not its assets, and the

---

[9] As discussed below, this assumption violated the Commissioner's own valuation rules.

[10] Public companies tend to have greater equity than do private companies, which are often owned by small groups. *See Hollis v. Hill*, 232 F.3d 460, 467 (5th Cir. 2000) (outlining the differences in equity ownership between public and private companies).

Sta-Home agencies did not have invested capital.

Wilhoite calculated the MVIC for the Sta-Home entities by extracting a "revenue pricing multiple" (RPM), a percentage that when multiplied by a company's annual revenues yield's that company's MVIC. To derive the RPM, Wilhoite identified two categories of "comparable" entities, one made up of publicly traded companies and one made up of merged or acquired entities. Wilhoite found the median RPM of publicly traded companies operating home-healthcare agencies to be .61. Because Sta-Home had been nonprofit, Wilhoite reduced that RPM by 50 percent to reflect a lower return on invested capital. When multiplied by Sta-Home's 1995 revenues, this RPM led to an MVIC of $13,563,000. Wilhoite ran the same analysis comparing merged and acquired companies and arrived at an RPM of .25 and an MVIC of $11,302,000.

Wilhoite's income approach calculated the value to a potential buyer that Wilhoite assumed would result from the buyer's ability to use a "cost-shifting" strategy.[11] Wilhoite determined that the annual value of cost-shifting, based on a

---

[11] This attribute of Medicare business enables a buyer to shift some of its overhead costs to Medicare's cost reimbursement system. If a home-healthcare agency sought less than the maximum reimbursement allowed by Medicare, a buyer could shift its overhead costs to the agency and Medicare would reimburse it to the extent there was room under the cost cap.

historical "cost-cap gap"[12] of .5 percent, was $1,408,168. Wilhoite applied a capitalization rate of 12.8 percent and calculated $11,001,000 as the present value of Sta-Home to a potential buyer.

Wilhoite also assigned a weighted percentage to each of the three values he derived. He assigned the largest weight to the income approach, followed by the publicly traded comparables market approach, followed by the merged or acquired comparables market approach, yielding a weighted-average MVIC of $11,604,000. Wilhoite then subtracted the amount of deficit that a buyer of the Sta-Home companies would have to pay for current liabilities and added the value of those current liabilities. Based on the accounting rule that the asset side and liability side of a company's balance sheet must be equal, Wilhoite reasoned that Sta-Home's MVIC (long-term liabilities and owners' equity) plus current liabilities would be equivalent to the value of the assets. Wilhoite valued Sta-Home's 1995 assets transferred from the nonexempt to the exempt entities at $20,858,000, over $7 million more than the $13,511,000 of liabilities assumed by the nonexempt entities.

---

[12] The "cost-cap gap" is the difference between the reimbursement amount sought by a home-healthcare provider and the maximum amount of reimbursement permitted by Medicare.

The Tax Court rejected Wilhoite's income method—the method that Wilhoite viewed as deserving the greatest weight—stating that the value of the cost-shifting strategy included "too many imponderables." *Caracci v. Comm'r*, 118 T.C. 379, 406 (2002). The Commissioner does not challenge this rejection of its expert's method. The Tax Court adopted only one part of one of Wilhoite's market-value approaches, making adjustments and filling in gaps to reach its own conclusion as to value.

The Tax Court adopted the part of the MVIC-Revenue approach that used publicly traded companies as comparables. In so doing, however, the Tax Court recognized that even the publicly traded companies Wilhoite used as "comparables" were in fact not comparable to the Sta-Home entities. Sta-Home operated in a much less advantageous market than many of the publicly traded companies, was much more heavily dependent on Medicare reimbursements than these companies, and did not offer the sophisticated and profitable therapies that many of these companies did. *Id.* at 405-06. Elsewhere in the opinion, the Tax Court recognized these important aspects of Sta-Home's operations and finances that distinguished it from the publicly traded companies Wilhoite used as comparables. For example, the Tax Court recognized Sta-Home's dependency on Medicare

22

reimbursements for over 95 percent of its revenues and the fact that Medicare disallowed .7 percent of Sta-Home's costs annually. But the Tax Court did not discuss these aspects in analyzing whether the publicly traded healthcare companies were sufficiently similar to Sta-Home to be "comparables," as Wilhoite's MVIC-Revenue valuation method required. Instead, although the Tax Court recognized that the publicly traded companies Wilhoite selected as comparables were different from Sta-Home in critical aspects, the Tax Court accounted for the differences by simply reducing the multiplier from .3 to .25 percent. The Tax Court did not explain the basis for reducing the multiplier by the amount it selected or why that reduction accounted for the differences between the publicly held companies and the Sta-Home agencies.

The Tax Court rejected Hahn's primary adjusted balance sheet valuation analysis and his secondary market-value analysis. In rejecting Hahn's secondary analysis, the Tax Court failed to recognize that Hahn used it only to confirm his primary valuation method, because Hahn himself recognized that the publicly traded healthcare companies were not sufficiently similar to the Sta-Home entities to serve as comparables in a stand-alone valuation analysis. The Tax Court also rejected

23

Hahn's adjusted balance sheet approach, believing that it undervalued Sta-Home's intangible assets. The Tax Court justified its reliance on part of Wilhoite's analysis and its rejection of all of Hahn's analysis and conclusion—despite the fact that only Hahn had detailed information about how Sta-Home's operations and finances worked under the complex Medicare regulations—by its belief that Sta-Home had "the potential to generate income and thus demonstrate a substantial fair market value." *Id.* at 405. The primary reason the Tax Court gave for this belief was that in 1995, the Sta-Home entities had generated nearly $45 million in revenues but had reported an operating loss that year, in part because the entities deducted depreciation for their automobile fleet and in part because they had declared employee bonuses, without which they would have reported "nontaxable income of approximately $1,785,000, or, in other words, more than enough to eliminate the accumulated deficit in net asset value." *Id.* On appeal, the Commissioner concedes that the Tax Court was simply wrong in this statement, but insists that the error is harmless.

Having rejected most of Wilhoite's analysis and all of Hahn's, the Tax Court put together its own valuation analysis

24

with the little that remained of Wilhoite's methodology. Using an RPM of .25—its own modification of Wilhoite's RPM of .3—the Tax Court calculated an MVIC of $11.3 million. The court then adjusted that amount by excluding four weeks of employees' deferred compensation from the current liabilities that Wilhoite had added to the MVIC and increasing current liabilities to reflect a reserve for disallowed Medicare claims.[13] Adding current liabilities to the adjusted MVIC, the Tax Court arrived at a fair market value of $18,675,000 for the tangible and intangible assets that the new nonexempt Sta-Home entities received from the old exempt Sta-Home entities. The court subtracted the liabilities the old exempt Sta-Home companies transferred to the newly created nonexempt entities—$13,511,000—from the fair market value of the assets, leaving an excess of $5,164,000. Because Sta-Home's transferred assets "far exceeded" the consideration paid by the Sta-Home nonexempt corporations—the assumed debts and liabilities—the Tax Court found a violation of I.R.C. § 4958 and ordered the taxpayers to pay $69,702,390 in excise taxes.

---

[13] The court reasoned that these four weeks of deferred payment were in fact long-term loans to the company for the duration of the employees' employment. The court classified the deferred salary as part of Sta-Home's invested capital (specifically as long-term liabilities). *Id.* at 407.

This appeal followed.

## II. Discussion

### A.    The Legal Standards

Section 4958 of the Internal Revenue Code prohibits certain acts of self-dealing between private foundations and company insiders.   The statute imposes a 25 percent tax on "excess benefit transactions," defined as follows:

> "[E]xcess benefit transaction" means any transaction in which an economic benefit is provided by an applicable tax-exempt organization directly or indirectly to or for the use of any disqualified person if the value of the economic benefit provided exceeds the value of the consideration (including the performance of services) received for providing such benefit.

I.R.C. § 4958(c)(1)(A).   "Disqualified persons" include any person in a position to exert "substantial influence" over the organization's affairs before the transaction, or any member of such person's family.   *Id.* at § 4958(f)(1)(A)-(B).[14]   If taxes imposed under the statute are not corrected within the taxable period, an additional tax equal to 200 percent of the excess benefit is assessed.   *Id.* at § 4958(b).

Whether the transfer of Sta-Home's assets qualifies as an

---

[14] The parties do not dispute that the Sta-Home for-profit entities and the Caracci family are "disqualified persons."

26

"economic benefit" depends on the fair market value of the companies' assets and liabilities. Fair market value is the price that a willing buyer would pay a willing seller, both having reasonable knowledge of all relevant facts and neither being under any compulsion to buy or sell. *United States v. Cartwright*, 411 U.S. 546, 551 (1973); *Dunn v. Comm'r*, 301 F.3d 339 (5th Cir. 2002). The willing buyer and seller are hypothetical persons rather than specific individuals or entities, and their characteristics are not necessarily shared by the actual seller or particular buyer. *Estate of Bright v. United States*, 658 F.2d 999, 1005–06 (5th Cir. 1981). At the same time, the valuation method must take into account, and correspond to, the attributes of the entity whose assets are being valued. *Dunn*, 301 F.3d at 356–57.

The Tax Court's factual determinations are reviewed for clear error and its conclusions of law are reviewed *de novo*. *Dunn*, 301 F.3d at 348. The determination of fair market value is a mixed question of fact and law; "the factual premises [are] subject to review on a clearly erroneous standard, and the legal conclusion[s are] subject to *de novo* review." *Id.* (quoting *In re T-H New Orleans, Ltd. P'ship*, 116 F.3d 790, 799 (5th Cir. 1997)). Although the mathematical computation of

27

fair market value is an issue of fact, the determination of the appropriate valuation method is an issue of law. *Dunn*, 301 F.3d at 348 (citing *Powers v. Comm'r*, 312 U.S. 259, 260 (1941)).

## B. Analysis

The conclusion is inescapable from the description of the background of this case. There are so many legal and factual errors—many of which the Commissioner acknowledges—infecting this case from the outset that reversal must result.

The Commissioner began the cascade of errors by issuing deficiency notices based on a brief, intermediate internal analysis. That analysis stated on its face that it was intermediate and that a final economic study had to be performed. Ignoring this disclaimer, the Commissioner issued valuation-based deficiency notices asserting § 4958 excise tax penalties against the Sta-Home entities and the Caracci family totaling $250,729,866 (plus interest) and income tax deficiencies and penalties totaling $8,330,064 (plus interest), and retroactively revoking the exempt status of the Sta-Home exempt agencies. Internal IRS documents reveal that the IRS issued the notices on the basis of an intermediate rather than final economic study to prevent the Caraccis from correcting

28

what the IRS viewed as prohibited transactions, which would have reduced the § 4958 "intermediate sanction" penalties. The second reason the IRS issued these premature notices was its concern over the statute of limitations. The IRS blamed the taxpayers for that problem. One of the IRS employees working on this case stated in an affidavit that the agency asked the taxpayers to consent to extend the limitations period and "informed [the taxpayers] that if the statute was not extended, statutory notices would be issued based on the best available information that [the IRS] had at that point," despite the fact that the IRS economist needed more time to analyze the case. Even more disturbing, the record reveals that despite recognizing the tentative and incomplete nature of the analysis used as the basis for the deficiency notices, the Commissioner defended the correctness of those notices for several years into this litigation and only conceded that the notices overstated the Commissioner's tax claim when the trial began in the Tax Court. In issuing the deficiency notices, the Commissioner did not adjust the analysis by the amount of liabilities the taxpayers assumed. As a result, the 1999 deficiency notices greatly overstated the excise tax liability. Despite this error, the Commissioner insisted throughout a two-

year audit and nearly two years of litigation that the deficiency notices were correct. It was not until March 5, 2001, in the opening statement before the Tax Court and in the cross-examination of the Commissioner's sole expert witness, that the Commissioner acknowledged that the 1999 deficiency notices were excessive and erroneous. This court has recognized that when, as here, the Commissioner persists in taking a position in litigation that is

> so incongruous as to call his motivation into question, . . . [i]t can only be seen as one aimed at achieving maximum revenue at any cost, . . . seeking to gain leverage against the taxpayer in the hope of garnering a split-the-difference settlement—or, failing that, then a compromise judgment—somewhere between the value returned by the taxpayer . . . and the unsupportedly excessive value eventually proposed by the Commissioner.

*Dunn*, 301 F.3d at 349. In *Dunn*, the result that the Commissioner obtained in the Tax Court was rejected. As in *Dunn*, the result in this case cannot stand.

The legal effect of the Commissioner's concession of error in the Tax Court is clear. "In a Tax Court deficiency proceeding, once the taxpayer has established that the assessment is arbitrary and erroneous, the burden shifts to the government to prove the correct amount of any taxes owed."

30

*Portillo v. Comm'r*, 932 F.2d 1128, 1133 (5th Cir. 1991). The Tax Court, however, did not place the burden of proof on the Commissioner. Instead, the Tax Court stated that while the parties disputed who bore the burden of proving "the central issue in this case; namely, the value of the transferred assets, . . . [w]e do not decide this dispute." *Caracci*, 118 T.C. at 382 n.4. Instead, the Tax Court rejected most of the only support the Commissioner provided for the net excess benefit finding, the testimony of the Commissioner's valuation expert. At that point, the Commissioner failed to meet his burden of proof. At that point, the Tax Court should have found in the taxpayers' favor. Its failure to do so was error, as a matter of law.

In rejecting most, but not all, of the Commissioner's valuation expert's opinions, the Tax Court made a number of errors in the valuation method it selected and in the facts it found in selecting and applying that method. The Tax Court's use of Wilhoite's modified MVIC-Revenue method for valuing Sta-Home's assets, particularly its intangible assets, is wrong as a matter of law. Wilhoite had no experience in appraising healthcare companies and knew very little about the Sta-Home entities or their assets and liabilities. Wilhoite did not

value Sta-Home's specific assets, but instead used a variation on an invested-capital valuation method to do a general and indirect valuation of Sta-Home's assets. The Tax Court adopted a modified version of Wilhoite's valuation approach, which is designed to value invested capital—not assets—to value the assets of a company that had no capital. The Tax Court did so with no legal support for the use of such a method to value the assets of these agencies, over the recognition of both Wilhoite and Hahn that this method was inferior to, and less rigorous than, an asset-valuation method. The Tax Court then compounded this error by deriving the invested-capital multiple it applied to the Sta-Home entities using the seven public companies Wilhoite selected as "comparables." Put simply, they were not.

The Tax Court considered the Commissioner's expert testimony against a record of stipulated or undisputed facts. Those facts included that between 95 and 97 percent of Sta-Home's revenues came from Medicare, compared to a national average of 38 percent, and that Medicare only reimbursed up to actual costs and disallowed .7 percent of Sta-Home's annual costs, thereby ensuring that the Sta-Home entities would continue to build liabilities, not assets, and could not profit. The more patient care the Sta-Home entities provided,

32

the more revenues they generated, and the more their losses grew. The parties did not dispute that the liabilities of the Sta-Home exempt entities exceeded assets for every year from 1987 through 1995. The parties did not dispute that the Sta-Home exempt agencies had $13.5 million in debts and liabilities that the newly created nonexempt entities assumed. The parties did not dispute that the Sta-Home exempt entities had sustained progressively larger net operating losses and capital deficits for the previous five years. The parties did not dispute that there was no likely potential buyer for Sta-Home. Despite these undisputed facts, the Tax Court's valuation method used an invested-capital valuation method that compared the Sta-Home entities with solvent, publicly traded companies with significant equity and a present ability to generate profits. This aspect of Wilhoite's analysis, accepted by the Tax Court, excluded distressed companies from the "comparables." Six of the seven "comparable" companies were generating profits at the time of Wilhoite's comparison and the seventh had substantial equity. Sta-Home had neither equity nor a record of profits. The Commissioner's expert erred when he stated to the Tax Court that two of the "comparable" public companies had operating losses; in fact, one of those companies was Sta-Home. The

33

Commissioner's expert also erred in telling the Tax Court that one of the public "comparables" had negative stockholder's equity; the only negative equity entry was Sta-Home. On cross-examination, the Commissioner's expert conceded that some of the "comparables" provided infusion services, which are fee-based and thus capable of turning a profit, and that some "comparables" provided respiratory services, which are also fee based. The Commissioner's expert further conceded that other "comparables" that provided residential medical services, pediatric care, adult day care, and companion care services either were fee-based or may have been; he did not know. The Commissioner's expert also admitted that many of the "comparables" were far less Medicare-dependent than Sta-Home.

A "comparable" must be substantially similar to the entity or asset that is at issue. *Van Zelst v. Comm'r*, 100 F.3d 1259, 1263 (7th Cir. 1996); *Estate of Palmer v. Comm'r*, 839 F.2d 420, 423 (8th Cir. 1988). As noted, none of the publicly traded entities Wilhoite chose were similar to Sta-Home. They were publicly traded. *See Dunn*, 301 F.3d at 350 (recognizing that public companies generally cannot be compared with private companies). They had capital. They were profitable. They were not limited to offering basic, and unprofitable,

34

therapies. Most important, they did not depend on Medicare for over 95 percent of their revenues, were not limited to recovery of actual costs, and did not have a portion of their actual costs disallowed every year. For these publicly traded "comparables," added revenue would logically create added value. For Sta-Home, the overwhelming dependence on Medicare reimbursements meant that added revenue meant added unreimbursed costs, which in turn generated greater losses. The Tax Court recognized some of these differences, but assumed—without explanation—that the publicly traded entities could still be used as "comparables" as long as the amount of the multiple derived was adjusted. The Tax Court did not explain how it arrived at the amount of the adjustment or how that amount transformed fundamentally different financial entities into "comparables."

Using an adjusted version of the Wilhoite MVIC-Revenue invested capital method, the Tax Court concluded that the value of the assets the nonexempt Sta-Home entities received exceeded the value of the $13.5 million in liabilities and debts they assumed by $5.1 million. As the taxpayers point out, the Tax Court concluded that a willing buyer would assume $13.5 million in liabilities and pay $5.1 million to acquire the right to

35

lose money on an ongoing basis.  The Tax Court explained why it believed this apparently illogical conclusion made sense: it found that Sta-Home had the potential to make a profit, which demonstrated that its assets had substantial fair market value.  This finding was clearly erroneous.

The Tax Court based its finding that the Sta-Home entities had the potential to make a profit on the finding that if Sta-Home had not paid a year-end bonus to its staff in 1995, it would have reported nontaxable income of approximately $1.78 million, "more than enough to eliminate the accumulated deficit in net asset value." *Caracci*, 118 T.C. at 405.  The Commissioner concedes that this statement is simply error.  The statement ignores the fact that under the Medicare system that accounted for between 95 and 97 percent of Sta-Home's revenues, there is no reimbursement unless there is an actual expense incurred.  If Sta-Home had not paid the bonuses, the Medicare reimbursements it received would have been reduced by an equal amount, leaving the same level of company losses.  The Tax Court did not take into account this effect of the Medicare reimbursement system on the Sta-Home entities, despite acknowledging it earlier in the opinion.  The Tax Court also overlooked the reason for the bonuses and what they revealed

36

about the Sta-Home entities' finances. These "bonuses" were unpaid, deferred employee pay, rather than discretionary bonuses. The deferred wages for existing employees, along with deferred first-month wages for newly hired employees, were mechanisms the taxpayers used to continue to operate despite their perennial cash-flow problems, their lack of profitability, their increasing operating losses, and their increasing deficits. The Commissioner acknowledged before the Tax Court that the salaries and bonuses were neither excessive nor unreasonable. Moreover, the Caracci family members withheld their own compensation in the same manner as compensation for the other employees. In short, these "bonuses" evidenced the unprofitable nature of the Sta-Home entities, not the potential for profitability, as the Tax Court erroneously stated.

The Tax Court also criticized Sta-Home—in the same section of the opinion that discussed its profit potential—for taking a large motor-vehicle depreciation deduction. The Tax Court ignored the fact that a home-healthcare agency providing services to a predominately rural population dispersed over a geographically large area necessarily has a heavily used fleet of vehicles. The Tax Court's suggestion that the taxpayers

37

were improperly exploiting the depreciation ignored the fact that it represented a very real cost that could not be annually expensed because of the Tax Code's specifications for the depreciable life of such personal property. *See generally* I.R.C. § 168. Indeed, stipulated facts in the record make it clear that far from exploiting the tax consequences of their corporate form, the Caracci family had been unable to take advantage of the income tax exemption the agencies "enjoyed" before 1995, because the agencies had consistently incurred net operating losses.

The Tax Court stated that the Sta-Home agencies had not profited from their business because of the entities' previous "tax-exempt" status. *Caracci*, 118 T.C. at 385-86. This statement further reflects a misunderstanding of Sta-Home's business and the regulatory regime under which it operated. The Sta-Home exempt agencies did not profit because they were virtually entirely dependent on Medicare reimbursements and the Medicare reimbursement system prohibits profit-taking, regardless of an agency's tax status. As the Tax Court recognized elsewhere in its opinion, the Sta-Home entities continued to operate in the same manner—at a loss—after converting to nonexempt status.

The Commissioner concedes that the Tax Court's statement that the Sta-Home entities could have reported nontaxable income of $1.78 million had it not declared a bonus in 1995 was wrong. Yet the Commissioner insists on this appeal that the error was harmless. The Tax Court opinion itself defeats this argument. The Tax Court reasoned from the mistaken assumption that the Sta-Home agencies could have generated positive net income by eliminating the 1995 employee "bonus" to the mistaken finding that the agencies had demonstrated a "substantial fair market value." *Id. at 405.* This mistaken statement was immediately followed by the Tax Court's decision to use an invested-capital method to value Sta-Home's assets and to use profitable public companies as "comparables" to derive the MVIC multiple as part of that method. If the Tax Court had not found that the Sta-Home entities had the potential to generate a positive net income and "thus demonstrate substantial fair market value," the Tax Court's decisions to use an invested-capital method for valuing assets and to use profitable public companies as comparables for unprofitable privately held agencies, would be not only erroneous but illogical. The Tax Court's $1.78 million error was anything but harmless.

The Tax Court's erroneous finding that the Sta-Home

39

entities had shown a potential for profitability and thus demonstrated that their assets had "substantial fair market value" is also the only apparent explanation for the decision to discredit the opinions provided by the taxpayers' expert witness, Hahn. As noted, in marked contrast to Wilhoite, Hahn had spent months in Mississippi analyzing the Sta-Home agencies and was a recognized authority on the home-healthcare industry. In marked contrast to Wilhoite, Hahn did the work to value the actual assets of the Sta-Home entities. Hahn used the valuation method that both he and Wilhoite agreed was the preferred and more rigorous approach to value assets. Neither the Tax Court nor the Commissioner disputed Hahn's tangible asset valuations, which attributed values between $8.4 and $8.7 million. The Tax Court rejected Hahn's intangible asset valuations, which attributed approximately $2.7 million to the workforce, including the certificates and licenses, because Hahn's conclusion that the value of the assets the nonexempt entities received from the exempt entities was less than the $13.5 million in liabilities they assumed was inconsistent with the Tax Court's (erroneous) finding that the Sta-Home entities had "demonstrated substantial fair market value."

The Tax Court's mistaken belief that Sta-Home's intangible

assets had substantial fair market value led it to ignore its own long-recognized position that unprofitable intangible assets do not contribute to fair market value unless those assets produce net income or earnings. Revenue Rule 59-60 requires the IRS to assign zero value to unprofitable intangible assets. *See* Rev. Rul. 59-60, 1959-1 C.B. 237 ("The presence of goodwill and its value, therefore, rests upon the excess of net earnings over and above a fair return on the net tangible assets."). The Tax Court (and reviewing courts) have recognized this. *See Fox River Paper Corp. v. United States*, 65 F. Supp. 605, 607 (E.D. Wis. 1946), *aff'd* 165 F.2d 639 (7th Cir. 1948); *Rosen v. Comm'r*, 62 T.C. 11 (1974), *aff'd* 515 F.2d 507 (3d Cir. 1975). The Tax Court clearly erred and violated its own prior rulings in failing to recognize that the Sta-Home exempt agencies' unprofitable intangible assets—including the workforce, the licenses, the CONs, the Medicare-dependent client base, and the aging and largely uncollectible accounts receivable—had little or negative market value.

Hahn established the value of the Sta-Home exempt agencies' tangible assets at a range between $8,421,977 and $8,787,492. Neither the Commissioner nor the Tax Court challenged this figure. The parties agreed that the for-profit

41

entities assumed roughly $13.5 million in liabilities.  The Tax Court concluded that the Sta-Home exempt agencies' total asset value was $18,675,000, meaning that the agencies' intangible asset value had to be approximately $10,000,000.  The parties agree that the Tax Court clearly erred in including the $1.78 million in "bonus" money as an intangible asset.  Setting this error aside, there is no basis to assign over $8 million to the Sta-Home exempt agencies' remaining intangible assets, the largest of which—its patients—would only enable the agencies to *lose* money for the indefinite future.  The CON was similarly of little or no value as an intangible asset because it provided Sta-Home access to the same Medicare-dependent group of patients; neither Sta-Home (or another buyer) could raise prices on the services provided to these patients to generate revenue because Medicare precluded profit.  Even if the Tax Court assigned a significant value to the Sta-Home exempt agencies' other intangible assets, such as its trained workforce (which would need to be paid, representing further liabilities as well as future profits), and goodwill, the Tax Court would have had to find these remaining intangible assets were worth approximately $5 million to conclude that the taxpayers realized any net excess benefit from the transaction,

42

assuming that the Sta-Home nonexempt agencies assumed $13.5 million in liabilities from the exempt entities and that the exempt entities assumed approximately $8.5 million in tangible assets from the exempt agencies. There is no legal or factual basis for assigning a $5 million value to these intangible assets.

This case began and ends with the Commissioner's refusal to recognize the legal effect of its own errors. The Commissioner issued erroneous and excessive deficiency notices, yet persisted in defending them for nearly two years of litigation before the Tax Court. After the Commissioner admitted his erroneous deficiency notices, he failed to meet his burden of proving that the excise taxes he sought to collect were correct. The Commissioner presented an expert who used an inappropriate valuation method and lacked basic factual information essential to the asset valuation he was called on to provide. The Tax Court erred as a matter of law when it failed to find for the taxpayers after it rejected much of the Commissioner's expert's opinion and instead proceeded to use bits and pieces from that opinion to value the Sta-Home assets transferred to the newly created nonexempt entities. The Tax Court erred as a matter of law in the valuation method it

selected. In the process of arriving at and applying that method, and in struggling to make that method make sense, the Tax Court made a number of clearly erroneous factual findings. These errors led the Tax Court to reject the taxpayers' expert, whose adjusted balance sheet valuation method provided the only rational and justifiable valuation available in the record, and to find that a willing buyer would have paid $18.6 million for the Sta-Home exempt agencies despite their unprofitability. These errors require this court to reverse and render.

## IV. Conclusion

The Commissioner failed to perform a legitimate asset valuation analysis throughout the audit, discovery, and litigation of this case. The Tax Court erred as a matter of law in failing to hold the Commissioner to his burden of proof and in selecting an inappropriate and incorrect method to value the assets of the Sta-Home entities and made clearly erroneous factual findings in applying this valuation method. The Tax Court's errors do not require remand because the record makes it clear that the Commissioner cannot meet his burden of proof under 26 U.S.C. § 6213, *Portillo*, and *Dunn*. The Tax Court's decision is reversed and judgment is rendered in favor of the taxpayers.

44

**REVERSED AND RENDERED**